[Crim. No. 6955.   First Dist., Div. One.   Feb. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. WAYNE ROBERT RICHARDS, Defendant and Appellant.

Wilfred Humphries, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and John F. Henning, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant has appealed[1] from a judgment of conviction rendered on jury verdicts which found him guilty of escape from a state prison without force or violence in violation of subdivision (b) of section 4530 of the Penal Code, and sane at the time of the commission of the offense. He contends that the trial court committed prejudicial error in refusing to receive evidence, embodied in an offer of proof, on a proposed defense of coercion and duress as justification for the offense charged, and in refusing to give proffered instructions on the same issue. These points are examined and found wanting. The judgment must be affirmed.

On July 19, 1967, defendant was assigned to a farm crew as an inmate of the California Correctional Training Facility, Soledad, Monterey County. Sometime after 2:30 p.m. defendant left the work area without permission and hid in a corn field until dark. Defendant then proceeded to the main road, and caught a ride to King City. He was apprehended by the California Highway Patrol on July 20, 1967 at 2:30 a.m. at a service station in King City. Defendant was still in prison dress, and he made no attempt to resist arrest.

On his return to the prison on July 20th, defendant was admonished as to his constitutional rights and questioned by a correctional officer as to his motive for escape. Defendant stated that he left prison without permission because "he felt he was doing too much time, that he was proceeding to Los Angeles to his mother's place to engage a lawyer to see if something couldn't be done."

The prison records officer authenticated the "Summary of Sentence Data" which indicated defendant's commitment and his movement in and through the state prison system. On cross-examination the defendant brought out, over objection, that while at a conservation center camp between November 10, 1966 and March 28, 1967 he had complained that there was pressure from other inmates to engage in homosexual activity. The court sustained an objection to a question propounded to determine if the records indicated whether or not the authorities at the center had checked into defendant's

---

[1]The defendant filed his notice of appeal seven days prior to the pronouncement of judgment and sentence but after the jury had rendered its verdicts that the defendant was guilty and that he was sane at the time of the commission of the offense. The People do not question its timeliness. It may be treated as filed immediately after the rendition of judgment. (Cal. Rules of Court, rule 31(a); *People* v. *Conover* (1966) 243 Cal.App.2d 38, 40, fn. 1 [52 Cal.Rptr. 172].)

complaint. According to the summary, the complaints, coupled with a very poor camp record, resulted in defendant's retransfer to Soledad in March.

In his opening statement the attorney for the defendant stated: "Ladies and gentlemen of the jury, you heard what is called a prima facie case of escape. The law provides that in certain circumstances there are defenses to crimes. . . . The law as to the various defenses will be stated to you by the Court. I will not attempt to state it. But the defense we are raising is called duress. Coercion. And we are going to present a series of witnesses, including the defendant himself, and these witnesses and the defendant will tell you of the threats made to his life and the reason that he ran away in order to save his own life, at least in his own mind he was doing this. And this will be the nature of our defense. . . ."

The training officer in charge of defendant's work detail was called as a witness for the defendant. He testified that he had worked in the prison system for approximately 20 years and was familiar with the expressions used by prisoners around the prison; that "a snitch" was someone who tells on someone else; and that if one prisoner disclosed that another prisoner was forcing him to commit homosexual acts it would be considered one of the more serious, if not the most serious, form of snitching. An objection to the relevancy and materiality of the next question—"What in your experience usually happens to inmates who snitch?"—was sustained.[2]

The court, at the request of the defendant, thereupon heard argument outside the presence of the jury. In the course of this argument the defendant adverted to the provisions of subdivision Eight of section 26 of the Penal Code.[3] He represented to the court that acts of sodomy had been inflicted on the defendant, that the defendant did snitch, that threats were made upon his life, that the guards would do nothing, and that defendant had exhausted every possible remedy short of

[2]No review has been sought of the propriety of the court's ruling on this question, which merely initiated the discussion which followed. In any event, it would appear that the defendant's, not the officer's, knowledge and experience would be the only relevant evidence on the defendant's motivation if it in fact were a proper issue. (See *People* v. *Mathis* (1965) 63 Cal.2d 416, 430 [46 Cal.Rptr. 785, 406 P.2d 65].)

[3]Section 26 of the Penal Code provides in part: "All persons are capable of committing crimes except those belonging to the following classes: . . . Eight—Persons (unless the crime be punishable.with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

escape to avoid the threat of death. The court adhered to the view that the threat, in order to be a justification, would have to be a threat designed to directly induce the act with which the defendant was charged. In response to the court's invitation to make an offer of proof, the defendant represented that inmate Joel Blume would testify "that inmates told him to remain away from the defendant . . . because Wayne Richards was going . . . to be killed . . . so keep his distance away from him or he would be killed too." Defendant himself would testify that "he was told by Mr. Blume who confided in him that he was marked to be killed or seriously injured and that the defendant understood this was going to be imminent, immediate, or as soon as possible and he felt that he had two possibilities, one to go to the guards, something that he's tried in the past and the guards have only responded by telling him to punch someone in the mouth or to commit probably a worse crime than escape, and, number two, to remove himself from the threat; and the only other way to remove himself from the threat is to remove himself from the imprisonment, the prison itself; and for this reason the defendant took the only alternative that he saw."

The court sustained the prosecution's objection to the testimony which had been offered. Thereupon, the defendant rested without presenting any further evidence.[4]

---

[4]At the sanity trial inmate Blume testified, "I was told that I had best stay away from him because there was a couple of knives waiting to be stuck in him and if I was around him at the time I would be stuck also." He further averred that he passed this information on to defendant three or four days prior to the time of the escape. The defendant testified that "near to just prior" to his escape he had been forced with violence to submit to homosexual acts at Soledad; that he had told on some inmates at the conservation center (who presumably had engaged in similar attacks); that he learned that word of his having done so had reached Soledad; that five inmates showed him a piece of steel like a knife and told him ". . . you told on our friends up there. . . . Before this week is over we're going to [shank (stab) you]"; that three nights later he was jumped from behind by two inmates who got him in position on a lawn and had him by the neck; that they told him he had a choice; that they said "You snitched. You're dead" but that he could avoid trouble by submitting to acts of sodomy; that on his refusal they said, "You don't have any choice" and "We'll see you before the week is over, we'll see what you're going to be or not"; that he reported his fears to a correctional lieutenant and was told to settle down and to find himself an old man to take care of him; that on the Sunday (July 16th, three days) prior to his escape on July 19th he reported his trouble to the chaplain and was advised to try to defend himself and fight his persecutors; that he did not seek further psychiatric help because consultations at the camp with a nurse, a doctor, the head counselor and a psychologist had produced only advice to grow up and fight back; that he never voluntarily submitted to any homosexual acts or had any desire to engage in

The instructions offered by the defendant included the following subjects: the effect of threats and menace as set forth in CALJIC Instruction No. 71-F (Revised) as found in 1967 Cumulative pocket part;[5] considerations governing the determination of whether a danger should be considered as imminent and immediate, predicated on *People* v. *Villegas* (1938) 29 Cal.App.2d 658 [85 P.2d 480] (see *infra*);[6] and an instruction on necessity as a defense.[7] The court in fact instructed the jury, "The reasons, if any, given for the alleged escape are immaterial and not to be considered by you as in any way justifying or excusing, if there was such. The only requirement for the commission of the crime of escape is that the defendant intentionally, wilfully, and unlawfully, departed from the limits of his custody." Since the defendant's offer of proof had been rejected, there was no evidence to show any legal justification, and the instructions were properly refused. (See *People* v. *Bross* (1966) 240 Cal.App.2d 157, 167-169 [49 Cal.Rptr. 402].) They are only material insofar as they highlight the respective contentions of the parties on the question of what type of coercion, compulsion or necessity may relieve a person of responsibility for what would otherwise be a criminal act.

---

them; that he found them revolting; that he did not know how to fight and could not bring himself to fight; and that he thought the threats were serious, that he would be dead, and he just wanted to get away.

[5]This instruction read: "A person is not guilty of crime when he commits an act or engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: 1. Where the threats and menaces are such that they would create in the mind of a reasonable person the fear that his life would be in imminent and immediate danger if he did not commit the act or engage in the conduct charged, and 2. If such person then believed that his life would be so endangered. This rule does not apply to threats, menaces, and fear of future danger to his life."

[6]This instruction read: "Whether a danger should be considered an imminent and immediate danger as opposed to a future danger is a question of fact to be determined by you the jury. Whether a danger is imminent or immediate will depend on all the surrounding circumstancs, including the defendant's ability to withdraw and avoid the danger."

[7]This instruction read: "Necessity is a defense to criminal prosecution under certain circumstances. As a defense to escape from a penal institution the defense is necessarily limited to those cases where the remedy to the situation producing the necessity lies beyond the control of the prison authorities and personnel. For example, if a prison caught fire the inmates would probably not be guilty of the crime of escape if they fled to save themselves from the conflagration. On the other hand if an inmate escaped because he felt escape necessary to save himself from treatment at the hands of the imprisoners [*sic*] authority then this would not be a valid defense, since by being imprisoned it is expected that an inmate should accept the policies, action, and treatment of the imprisoning authorities as part of his punishment. Your task is to determine first,

In the argument concerning the admission of evidence there was a failure to articulate the distinction between the compulsion or duress recognized in the code (see fns. 3, 5 and 6, *supra*), and the principle of necessity (fn. 7, *supra*) which recognizes a defense of justification because of the duress occasioned by extrinsic circumstances. This distinction has been generally recognized by text writers in the field of criminal law.[8]

■ The court properly rejected the evidence insofar as it was offered to show the defendant's lack of capacity to commit the offense under provisions of Penal Code section 26 (see fn. 3 *supra*). The statute, since it refers to the option to refuse or accept, contemplates that the threat or menace be accompanied by a direct or implied demand or request that the actor commit the criminal act. In this case there was no offer to show that anyone demanded or requested that the defendant escape. (Cf. *People* v. *Wester* (1965) 237 Cal.App. 2d 232, 237-238 [46 Cal.Rptr. 699] ; and see *People* v. *Winkelspecht* (1965) 237 Cal.App.2d 227, 229-230 [46 Cal.Rptr. 697] ; *People* v. *Otis* (1959) 174 Cal.App.2d 119, 123-126 [344 P.2d 342] ; and *People* v. *Ganger* (1950) 97 Cal.App.2d 11, 13 [217 P.2d 41].)

In *People* v. *Sanders* (1927) 82 Cal.App. 778 [256 P. 251], the court approved an instruction reading as follows: " ' . . . a person who commits an act under threats or menaces sufficient to show that he had reasonable cause to believe and did believe that his life would be endangered if he refused, is incapable of committing a crime.

" 'In order for duress or fear produced by threats or menace to be a valid, legal excuse for doing anything, which otherwise would be criminal, the act must have been done under such threats or menaces as show that the life of the person

---

whether correction of the conditions producing the necessity was within or beyond the control of the imprisoning authorities. If correction of the conditions producing the necessity was beyond the control of the imprisoning authorities then necessity is no defense to any type of escape. If correction of the conditions producing the necessity was beyond the control of the imprisoning and [*sic*] authorities, as in the case of a fire out of control then necessity may be a defense to an escape accomplished without force or violence. Whether the correction of conditions giving rise to a necessity was or was not within the control of the imprisoning authorities in this is a question of fact for you the jury to determine.''

[8] Williams, Criminal Law (2d ed. 1961) §§ 229-239, pp. 722-746 and §§ 242-247, pp. 751-762; Hall, General Principles of Criminal Law (2d ed. 1960) pp. 415-448 and see pp. 228-237; Clark & Marshall, Law of Crimes (6th ed. Wingersky, 1958) § 5.15, pp. 322-325 and § 5.16, pp. 325-329; 1 Wharton's Criminal Law and Procedure (Anderson ed. 1957)

threatened or menaced was in danger, or that there was reasonable cause to believe and actual belief that there was such danger. The danger must not be one of future violence, but of present and immediate violence at the time of the commission of the forbidden act. The danger of death at some future time in the absence of danger of death at the time of the commission of the offense will not excuse. A person who aids and assists in the commission of the crime, or who commits a crime, is not relieved from criminality on account of fears excited by threats or menaces unless the danger be to life, nor unless that danger be present and immediate.' " (82 Cal.App. at p. 785. Accord: *People* v. *Villegas, supra,* 29 Cal.App.2d 658, 661; and see Annotation, Criminal Law—Defense—Coercion (1955) 40 A.L.R.2d 908.) If the statutory test of capability were deemed to be applicable to the evidence contained in the offer of proof, it still falls short of establishing that there was a present and immediate danger to defendant's life on the afternoon he secreted himself and left the confines of the prison. (See *People* v. *Otis, supra,* 174 Cal.App.2d 119, 125-126.) It may further be noted that his subsequent testimony reflected that he was given alternative courses of action. The submission to sodomy, abhorrent as it may be, falls short of loss of life. The commission of that offense, in response to the threat to his life, accompanied by requests or directions to submit, would fall within the statutory pattern. (See *People* v. *Anderson* (1968) 264 Cal.App.2d 271, 274 [70 Cal.Rptr. 231].)

There remains for consideration the question of whether the evidence offered by the defendant should have been received to show justification on the grounds of necessity. The principle has been phrased as follows: "An act which would otherwise be a crime may be excused if the person accused can show that it was done only in order to avoid consequences which could not otherwise be avoided, and which, if they had followed, would have inflicted upon him, or upon others whom he was bound to protect, inevitable and

---

§ 123, pp. 261-267 and § 171, pp. 403-405; Perkins, Criminal Law (1957) pp. 842-851; American Law Institute, Model Pen. Code (Proposed Official Draft 1962) § 2.09, p. 40 and § 3.02, p. 45; 22 C.J.S., Criminal Law, § 44, p. 135 and § 49, p. 185; 21 Am.Jur.2d, §§ 99-100, pp. 179-180; 14 Cal.Jur.2d, Criminal Law, § 217, p. 464, § 219, p. 466, and § 222, p. 468; 1 Witkin, Cal. Crimes (1963) §§ 155-157, pp. 149-151, and § 248, p. 232; but cf. 1 Burdick, Law of Crime (1946) §§ 198-201, pp. 260-264; and 1 Bishop's Criminal Law (9th ed. 1923) §§ 347-355, pp. 242-250. See also Newman & Weitzer *Duress, Free Will and the Criminal Law* (1957) 30 So.Cal.L.Rev. 313.

irreparable evil; that no more was done than was reasonably necessary for that purpose; and that the evil inflicted by it was not disproportionate to the evil avoided.'' (Clark & Marshall, Law of Crimes (6th ed., Wingersky, 1958) p. 322, quoting from Stephen, Digest of the Criminal Law, art. 32. See also American Law Institute, Model Penal Code (Proposed Official Draft 1962) § 3.02.)

In *People* v. *Whipple* (1929) 100 Cal.App. 261 [279 P. 1008], the court stated, ''In this state the common law is of no effect so far as the specifications of what acts or conduct shall constitute a crime is concerned . . . likewise with excuses or justifications—if no statutory excuse or justification apply as to the commission of the particular offense, neither the common law nor the so-called 'unwritten law' may legally supply it.'' (100 Cal.App. at p. 262. See also *People* v. *Harris* (1961) 191 Cal.App.2d 754, 757-758 [12 Cal.Rptr. 916].) The court noted ''if the facts were as stated by the defendant, he was subjected to brutal treatment of extreme atrocity.'' (*Id.* at p. 266.) The defendant contended that the brutal and inhumane treatment he received made his imprisonment intolerable and justified the escape. The court, nevertheless, upheld the action of the trial court ''. . . in instructing the jury that an excuse for the escape of defendant, founded upon any alleged unsanitary conditions, or alleged harsh, brutal or inhumane treatment received by him at the hands of his custodian, would constitute no defense in the law for the commission of the offense.'' (*Id.*, p. 262.) From the foregoing it would appear that the principle of justification by necessity is not recognized under the law of this state, except as it is embodied in the Penal Code.

Nevertheless in *Whipple* the court, as an alternative ground of decision, did recognize the existence of the principle,[9] and found that it did not apply to the facts to which the defendant had testified. The opinion recites, ''Although authority exists to the effect that, generally speaking, absolute necessity will excuse the commission of a criminal offense [citations]; so far as the crime of escaping from a jail is concerned, the authorities are in practical accord in holding that ordinary

[9]Cases dealing with the question of whether a partner in a prohibited sexual act is an accomplice suggest that compulsion, short of that proscribed in Penal Code section 26, subdivision Eight, will render the coerced partner free of prosecution for the offense in which he participated. (See *People* v. *Anderson* (1968) 264 Cal.App.2d 271, 274-278 [70 Cal.Rptr. 231]; *People* v. *Otis* (1959) 174 Cal.App.2d 119, 123-125 [344 P.2d 342]; but cf. *People* v. *Hart* (1950) 98 Cal.App.2d 514, 515-516 [220 P.2d 595].)

adverse circumstances will not present such a condition as will support a legal excuse for effecting an escape. In 1 Hale, P.C., 611 (1736), it is said that 'If a prison be fired by accident, and there be a necessity to break prison to save his life, this excuseth the felony.' . . . But whatever may be the common law with reference to escape, where either *'se defendendo,'* misfortune, or 'first offense' is or may be invoked as a defense to the accusation for which imprisonment has resulted, so far as the decisions by the courts of sister states are concerned, neither the unsanitary condition of the jail [citation], fear of violence from third persons [citation], nor unmerited punishment at the hands of the custodian [citation], will present a situation which in the law may be accepted as an excuse for violation of the statute." (*Id.,* pp. 263-264. See also *People* v. *Miller* (1961) 196 Cal.App.2d 171, 176 [16 Cal.Rptr. 408], Wharton's Criminal Law and Procedure (Anderson ed. 1957) § 1378, p. 769; and Annotation, Justification for Escape (1960) 70 A.L.R.2d 1430.) The court concluded, "It is manifest that to allow a prisoner to decide whether the conditions justify him in attempting to escape would be destructive of the necessary discipline which must be maintained in any well-ordered prison. . . . Generally speaking, when a man has been lawfully convicted of a crime, and a judgment of imprisonment has been regularly entered against him, it becomes his duty to submit to the penalty. Unquestionably, it is the duty of the state and of its officers to accord to the prisoner such safety and humane treatment as may be consistent with the safekeeping of the prisoner. It is, unfortunately, possible for the conditions of imprisonment to be so unwholesome as to seriously imperil the health and life of the prisoner by exposure to infection and disease, and unhappily it is possible for prison guards to subject prisoners to abuses and serious physical injury unjustified by any disciplinary need. However, a prisoner who escapes for any such reason does so at his peril." (100 Cal.App. at p. 265.)

Defendant seeks to avoid the effect of this controlling precedent on the theory that *Whipple* recognized that the improper treatment might constitute a justification for escape if the defendant had exhausted all other alternatives. The court did observe, ". . . the record fails to disclose any attempt on the part of defendant to show that before escaping, he had, in good faith or at all, endeavored to be relieved by lawful means from any alleged improper irregularities or practices which he claimed were present in the matter of his

confinement." (*Id.*, p. 265.) Nevertheless immediately thereafter the court acknowledged, "In a remote mountain camp, far from the sheriff's office, what relief could he obtain by telling his custodian that he wanted to see the sheriff? If the defense could be admitted at all, it should not be conditioned upon the making of a plainly useless request." (*Id.*, p. 266.) It is, therefore, apparent that the court's decision would not have been altered had *Whipple* shown, as the defendant alleges here, that he had reported his complaints to the authorities and had been denied relief.

In *Whipple*, and as well this case, the reviewing court was struck by the enormity of the pressure to which defendant was subjected if his allegations were true.[10] The court observed, ". . . it is with very great reluctance that we admit that, under practically all of the authorities, the foregoing opinion states the established law. . . . The function of the court is to declare the law as it is, and we are not authorized to usurp the place of the legislature, which has the power to make laws, and the duty to make just laws." (*Id.*, pp. 265-266.)

The Legislature has in fact adopted many statutes regulating the treatment of prisoners. (See 2 Witkin, Cal. Crimes (1963) Punishment for Crime, §§ 917 and 918, pp. 870-872.) The courts of this state have extended the use of the writ of habeas corpus to protect the fundamental basic rights of prisoners. (*In re Riddle* (1962) 57 Cal.2d 848, 851 [22 Cal.Rptr. 472, 372 P.2d 304] ; and see Witkin, *op. cit.*, §§ 918 and 919, pp. 872-875.) The principle of justification by necessity, if applicable, involves a determination that "the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged." (See Model Pen. Code., *op. cit.*, § 3.02 (1) (a) ;

---

[10]At the sanity trial further testimony was adduced from a psychiatrist that the defendant was a passive individual who has always had difficulty in expressing his masculinity and aggressive behaviour; and that he was likely to become anxious, threatened and impulsive when exposed to force and pressure. This evidence was not, as urged by defendant, competent on the issue of guilt. The crime of escape requires no specific mental state, only a general criminal intent. The only requisite for its commission is that defendant do the act which constitutes the crime. (*People* v. *Goldman* (1966) 245 Cal.App.2d 376, 383 [53 Cal.Rptr. 810] [disapproved on other grounds *In re Smiley* (1967) 66 Cal.2d 606, 627 [58 Cal.Rptr. 579, 427 P.2d 179]]; *People* v. *Miller* (1961) 196 Cal. App.2d 171, 175-176 [16 Cal.Rptr. 408]; *People* v. *Haskins* (1960) 177 Cal.App.2d 84, 87-88 [2 Cal.Rptr. 34].) There is no place for psychiatric evidence to show diminished capacity (*People* v. *Goldman, supra,* at p. 383), or inability to resist an impulse (*People* v. *Villegas* (1938) 29 Cal.App.2d 658, 663 [85 P.2d 480]).

and Clark and Marshall, Law of Crimes, *supra*.) The compulsion from the harm or evil which the actor seeks to avoid, should be present and impending, as in the case of the threat or menace contemplated by the Penal Code. This is not a case where the prisoner departed from the limits of his custody while pursued by those who would take his life because he "snitched," or by those who sought by force and violence to have him submit to sodomy. Moreover, any and all alternative courses should be considered, and it must be determined that the threatened consequences could not otherwise be avoided. (See Clark and Marshall, Law of Crimes, *supra*.) The evil sought to be prevented is not only the escape of the prisoner in question, but also, as noted in *Whipple, supra*, the destruction of the general discipline of the prison.

The balancing of all these factors leads to the conclusion that the principles set forth in *Whipple* should be adhered to and applied in this case. The prisoner should be denied self-help by escape, and should be relegated to relief through established administrative channels, or, that failing, through the courts. The trial court properly rejected defendant's offer of proof and the instructions which depended upon that evidence.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.