STATE of Missouri, Respondent,

v.

John Charles GREEN, Appellant.

No. 55031.

Supreme Court of Missouri,
En Banc.

Sept. 13, 1971.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

Joan M. Krauskopf, Columbia, C. M. Hulen, Jr., Moberly, for appellant.

HENLEY, Judge.

John Charles Green (hereinafter defendant) was charged by information with the offense of escape from a state institution [1] in which he was lawfully confined, a felony. Section 557.351.[2] He waived a jury, was tried before the court, found guilty, and was sentenced to imprisonment for a term of three years. He appeals. We affirm.

1. The Missouri Training Center for Men, at Moberly, an institution under the control of the State Department of Corrections.

2. Statutory references are to RSMo 1969 and V.A.M.S.

Briefly, the evidence is that defendant was convicted of burglary in November, 1966, and sentenced to imprisonment for a term of three years in the custody of the Department of Corrections; that on April 14, 1967, at about 6 p. m., while serving this sentence at the Training Center, he disappeared from that institution and was apprehended the next day by a State Highway Patrolman some distance from the Training Center. Defendant tacitly concedes that these are the facts and that, standing alone, they are sufficient to sustain his conviction. However, he contends that his escape was justified and that the justification constituted a legal defense to the charge of escape.

At a pretrial conference the defendant informed the court that his defense would be that prior homosexual assaults and threats near noon on the day of his escape of a homosexual assault upon him that night by other inmates caused the conditions of his confinement to be intolerable; and, that these conditions, together with the state's denial to him of access to the courts, made it necessary that he escape in order to protect himself from submission to the threatened assault or the alternative of death or great bodily harm. As a result of this conference it was agreed that on trial day, and before a jury would be impaneled, the court would hear evidence offered by defendant in support of his defense, consider it as an offer of proof, and rule on its sufficiency as a legal defense.

The evidence offered on this issue is, in substance, that near the end of December, 1966, shortly after defendant became an inmate at the Training Center, he was attacked in his cell at night by two inmates and submitted to acts of sodomy under threat of death or great bodily harm; that immediately thereafter he feigned an attempt at suicide and was taken to the prison hospital where he told the authorities of the assaults and asked to be removed from the institution to avoid further assault; that he was told by the Center authorities

to resolve his own problems and to "go back and fight it out." Approximately two weeks later, near the middle of January, 1967, he was again homosexually assaulted in his cell, this time by three inmates. He again feigned an attempt at suicide and requested that he be taken to the hospital. Instead he was placed in a disciplinary cell until the next morning when he was x-rayed and immediately thereafter taken before the Disciplinary Board and charged with attempted self-destruction. He informed this Board of the assaults, requested protection, and was moved to another wing of the Training Center. He says that he was told by a member of the Board that he would have to "fight it out, submit to the assaults, or go over the fence." Defendant declined to disclose the names of his assailants to the Training Center authorities. Approximately three months later, on April 14, 1967, during the noon hour, a group of four or five inmates told defendant that they would be at his cell that night and he would submit to their homosexual desires or they would kill or seriously harm him. He did not report this threat to anyone. He escaped at about 6 p. m. that evening.

Defendant further offered to prove that he was indigent; that legal services for indigent persons were not provided at the Training Center by lawyers or law students, or by so-called "jail house lawyers" who "practiced" clandestinely only; that the only law books in the Center's library were a set of the Missouri Revised Statutes.

The court ruled that the evidence did not constitute a legal defense. Immediately after this ruling, defendant waived a jury, evidence was offered by the state on the offense charged, and, as previously noted, the court found him guilty.

Defendant asserts that the described conditions of his confinement constituted cruel and unusual punishment within the meaning of the Eighth Amendment; and that subjecting him to those conditions

without providing reasonable protection for his person and without according him a means of determining the propriety of his confinement denied him equal protection of the law and due process of law in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

Two of the points in his brief are that "[t]he trial court erred in excluding the offer of proof because to do so violated due process in that it permitted appellant to be convicted and punished for escape even though [1] escape was his only means of obtaining access to the courts for review of allegedly unconstitutional treatment, [and 2] the state had made escape necessary for appellant to protect himself from impending grave physical harm."

In his printed argument, defendant states quite candidly that the alleged unwholesome and unconstitutional conditions, *in themselves alone*, would not justify his escape; that "[t]he needs for security and discipline in the corrections system are such that it would be folly to create a defense for any prisoner who escaped the system because he thought he was being held under unconstitutional or unwholesome conditions." His position is that these conditions " * * * *combined with* one or both of two *other* factors do justify his escape * * *" and that the other factors are " * * * [1] *denial by the State of access to the courts* for redress of the unconstitutional conditions * * * [and] * * * [2] the *necessity* under those unconstitutional conditions to escape as the only means of protecting himself * * *." In oral argument, he stated his position succinctly as a denial of due process by exclusion of his "defense of necessity."

█ There is no evidence that the state denied him access to the courts, unless it may be said that the Training Center rule forbidding "jail house lawyers" from giving legal advice to and preparing pleadings for inmates was such denial, or that failure to have lawyers or law students avail-

able to inmates at the Center was such denial. Defendant argues that it is precisely for these reasons that he was denied access to the courts. However, there is no evidence that during the period between the beginning of his confinement and the hour of his escape he desired or sought access to the courts. There can be no denial unless there exists in the defendant a desire and a seeking of access to the courts. The mere fact that legal assistance was not directly or immediately available to inmates in general and, therefore, would not have been available to him *if* he had sought access to the courts does not afford him substantial ground upon which to base a claim of denial of access where there is no showing that he, in fact, desired access to the courts. To hold, as defendant requests, that the state denied him access to the courts would require that we assume the existence of a necessary fact, one which he declined or neglected to furnish. We decline so to assume.

Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), upon which defendant primarily relies in support of his contention that he was denied access to the courts, is not applicable to the facts in this case. *Johnson* involved an attack by a "jail house lawyer" upon a prison regulation which prohibited him from advising with or preparing petitions for writs for other inmates.

Moreover, the record shows that the mails were available to defendant for access to the courts. We know from our records that this means of access is now, and has been since long before January, 1967, used by inmates in increasing numbers, and through that method inmates readily secure the appointment of a lawyer to assist them.

The state did not deny defendant access to the courts.

Defendant says he has been unable to find any Missouri cases supporting his theory of "necessity" as a defense in this case. We find none. The state refers us

to People v. Richards, 269 Cal.App.2d 768, 75 Cal.Rptr. 597 (1969), for a concise definition of the defense of necessity. The California Court of Appeal said: "The principle of justification by necessity, if applicable, involves a determination that 'the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged.' * * * The compulsion from the harm or evil which the actor seeks to avoid, should be present and impending * * *." 75 Cal.Rptr. at 604.[3]

■ This is not a case where defendant escaped while being closely pursued by those who sought by threat of death or bodily harm to have him submit to sodomy. Moreover, the threatened consequences of his refusal to submit could have been avoided that day by reporting the threats and the names of those making the threats to the authorities in charge of the Center. Defendant had several hours in which to consider and report these threats.

■ The defense of "necessity" was not available to defendant and the court did not err in excluding his offer of proof. Defendant's defense resolves itself into the simple proposition that the conditions of his confinement justified his escape. Generally, conditions of confinement do not justify escape and are not a defense. State v. King, Mo., 372 S.W.2d 857 [6]; State v. Pace, Mo., 402 S.W.2d 351; State v. Hart, Mo., 411 S.W.2d 143; State v. Rentschler, Mo., 444 S.W.2d 453 [4].

The judgment is affirmed.

All concur except SEILER, J., who dissents in separate dissenting opinion filed.

SEILER, Judge (dissenting).

As is apparent from the majority opinion, the question before us is whether the evidence offered by the defendant amounted to a legal defense. Therefore, unlike the usual criminal appeal, we do not commence with the situation where the factual issues to which the law is being applied have been resolved against the defendant, in which case we can ignore his version of the facts. Here the defendant is entitled to a review of his proposed defense on the basis that all that appears in the record favorable to him is to be taken as true. Looking at the record in this light, a jury could have found the facts as follows:

Defendant was white, nineteen years old, five feet, nine inches tall and weighed about one-hundred and fifty pounds. At the Moberly Training Center for Men, the prison population was composed of about six-hundred inmates, mostly second offenders at least twenty-five years old, and at least twenty-five inmates were serving life sentences. The inmates were confined in single cells within a residential building. The physical structure of the residential building was formed by a central rotunda with the four inmate wings radiating outward. Within each inmate wing, there were seventy-nine cells. During the day, the inmates could wander freely within the residential building. The inmates were locked in the cells at night.

There were two guards assigned to each residential building for the period of the night shift. One of these guards stayed in the rotunda. The rotunda was separated from each wing by a heavy door. The second guard walked a circuit among the four wings. There were substantial periods of time during which a wing would be without supervision.

3. See also: State v. St. Clair, 262 S.W. 2d 25[2], l. c. 27–28, where this court said: "But, to constitute a defense to a criminal charge, the coercion must be present, imminent, and impending and of such a nature as to induce a well grounded apprehension of death or serious bodily injury if the act is not done. Threat of future injury is not enough. Nor can one who has a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily injury invoke the doctrine as an excuse."

There was a lock on the outside of each cell. The door could be unlocked with a master key. It appears that several master keys were illicitly in the hands of the inmates. These locks could easily be picked with any sharp object. There were no locks on the inside of the cell doors.

Inmate complaints could be sent to the prison administration by the use of "snitch-kites". A "snitch-kite" consisted of a written complaint transmitted through the intra-prison mail. It required several days to obtain any response to a "snitch-kite". An inmate could complain directly to a guard. Because of the physical structure of the residential buildings, it would be difficult to complain to a guard without the other inmates being aware of this action. Administrative policy was not to investigate a complaint of physical abuse unless the assailant .was identified. But if an inmate "snitched"—turned in somebody's name—his life wouldn't be worth "a plugged nickel"; he (the snitch) "was as good as dead right then". Unless a guard witnessed an assault, the alleged assailant would be allowed to remain within the general population during the investigation. The victim of an assault could be removed from the general prison population. However, such an inmate would be confined to the "hole", which was the area used to discipline prisoners. The prison provided no other facilities for the protective custody of a threatened inmate.

In late December, 1966, or early January, 1967, during the night, two inmates, one white, one black, picked the lock of defendant's cell door. At knifepoint, defendant was homosexually ravaged by both inmates. Two weeks later, three inmates, black and white, invaded defendant's cell, knocked him unconscious as he tried to flee, and raped him. Homosexual acts including sexual assaults were matters of common knowledge among the inmates.[1]

Following each sexual assault, the defendant injured or feigned injury to himself, in order to contact the prison administration. While hospitalized after the first attack, defendant informed the Assistant Superintendent of Treatment of the assault and requested protection. This prison official admonished the defendant to defend himself, and upon release from the hospital, defendant was returned to the same cell. After the second attack, defendant was taken before the Disciplinary Board where he informed the Board about the assaults.

---

1. During the offer of proof, several individuals who had been imprisoned at the Moberly Training Center for Men testified to the accuracy of this statement. In 1968, the Philadelphia District Attorney's Office and the Police Department investigated the incidence of sexual assaults within the prison system of Philadelphia. The report of this investigation was summarized in Davis, Sexual Assaults in the Philadelphia Prison System and Sheriff's Vans, 6 Transaction 8, (Dec. 1968). This article noted at page 9: " * * * sexual assaults in the Philadelphia prison system are epidemic * * * [V]irtually every slightly-built young man committed by the courts is sexually approached within a day or two after his admission to prison. Many of these young men, are repeatedly raped by gangs of inmates. Others, because of the threat of gang rape, seek protection by entering into a homosexual relationship with an individual tormentor. Only the tougher or more hardened young men, and those few so obviously frail that they are immediately locked up for their own protection, escape homosexual rape". The problem is not limited to the prison system of Philadelphia. A recent article in a metropolitan Missouri newspaper reported that two inmates had sexually assaulted a seventeen year old youth in the St. Louis County jail. St. Louis Post-Dispatch, August 13, 1971, at 10A. In recent years, the courts have acknowledged the existence of this situation, e. g. Holt v. Sarver, (E.D.Ark.), 309 F.Supp. 362; and it has been discussed in the scholarly journals. Comment, 48 L.Rev. 847, 865–869 and Note, 53 Ia.L.Rev. 671, 697–700. For a prisoner's comment on homosexuality within the prison, see Griswold, Misenheimer, Powers, and Tromanhauser, An Eye For an Eye, 161–172 (1970). It has been estimated the number of inmates who engage in homosexual activity ranges as high as 80%, 53 Ia.L.Rev., supra.

The Assistant Superintendent of Custody, a member of the Board, told defendant that the only protection defendant would receive was a cell change. This prison official told defendant that the alternatives were to defend himself, submit, or "go over the fence".

On April 14, 1967, defendant returned to his cell during the lunch break. Four or five black inmates gathered around his cell. They informed defendant of their knowledge of the previous acts of sodomy. They told him that they would return that evening to make him a "punk" (a person who plays a female role in homosexual incidents) for the remainder of his time in prison. These inmates threatened to "beat his head in" or kill defendant if he would not submit. Defendant believed it would do no good to ask the prison authorities for help, in view of what he had been told in response to his previous attempts to get help, so to avoid what he believed was inevitable, he quietly escaped about 6:00 o'clock that evening. He was found the next morning, on the side of a county highway, only a few miles from the prison and surrendered without resistance.

It is a fundamental legal principle that criminal punishment should not be visited upon the blameless. See Holmes, The Common Law, 1948, p. 50; "It is not intended to deny that criminal liability * * * is founded on blameworthiness * * * [A] law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear * * *." Juries in criminal cases are instinctively aware of this. One illustra-

tion of this principle is the right to present to the jury the defense of self-defense, State v. Robinson, (Mo.Sup.) 328 S.W.2d 667, where defendant was resisting attempted sodomy. The affirmative defenses of coercion and necessity are based upon the same principle.[2] "If a person commits an act under compulsion, responsibility for the act cannot be ascribed to him since in effect, it was not his own desire, or motivation, or will, which led to the act." Newman and Weitzer, Duress, Free Will and the Criminal Law, 30 So.Cal.L.Rev. 313. There appear to be no Missouri cases considering the defense of necessity, but it is well established that coercion is a defense to all crimes except murder. State v. St. Clair, (Mo.Sup.) 262 S.W.2d 25, 27.

I interpret the majority opinion to decide that the proposed defense is not available because (1) defendant did not delay his escape until his would-be assailants had him in close pursuit and (2) because he could have avoided his predicament had he only turned in their names earlier in the day.

As to the first, defendant knew from prior experience that if he waited until the band was close at hand, it would be too late. If escape were to save him, it had to be made earlier than the last minute. Five against one is hopeless odds. As to the second, this overlooks the evidence that to turn in the names to the prison authorities meant defendant was risking his life by being a "snitch".

Defendant had already been told by a high prison official that he had three alternatives: submit, defend himself, or escape.

**2.** A few courts and some legal scholars have recognized a distinction between the defenses of coercion and necessity based upon the nature of the force that compels the actor to do the criminal act. Coercion is compulsion exerted by a human force, while necessity is compulsion exerted by a physical force beyond human control. People v. Richards, 269 Cal. App.2d 768, 75 Cal.Rptr. 597, 601; Hall, General Principles of Criminal Law, (2d ed. 1960) 235–237 and 415–448. Courts often use the terms "coercion" and "necessity" interchangeably. Note, 21 Col. L.Rev. 71, 72. Other legal scholars believe that this distinction has no merit because the requirement in each defense remains a circumstance or condition that leaves no choice of a course of action, 1 Burdick, Law of Crime, (1946), 260–261.

The majority opinion does not recommend submission, and as a practical matter, self defense was impossible. All that was left was escape, and under these circumstances, the coercion and necessity were not remote in time, but present and impending. Escape or submission (and I do not believe defendant was unreasonable in not being willing to submit to five-fold sodomy) were literally all this defendant had left.[3]

There is a number of cases in which the defense of coercion has been offered to justify an escape, 70 A.L.R.2d 1430. These escape cases differ from the majority of cases in which the defense of coercion is asserted. Usually, the defendant is charged with the very crime that he was directly coerced to submit. State v. St. Clair, (Mo. Sup.), supra; State v. Lee, 78 N.M. 421, 432 P.2d 265; 40 A.L.R.2d 908. For instance, if the defendant here had been prosecuted for sodomy as a result of the first assault, it would seem clear that a defense of coercion would be available. In this case defendant sought to avoid committing the coerced act by resorting to escape. Because he was a prisoner, this action was a crime. The act of escape was just as much coerced as the prior act of sodomy. It is consistent with the principle underlying the defense to allow it to be asserted here.

This case differs much from the usual escape case. Defendant should have been permitted to submit to the jury the defense of coercion as justification for the escape, and I, therefore, respectfully dissent. The evidence shows defendant was confronted with a horrific dilemma, not of his making. No one, I am sure, wants to force a prisoner to live under conditions where he must either become a "punk" and debase himself, or a "snitch" at the risk of his life, but nevertheless this is the effect of our decision, until and unless the state improves the conditions in the prisons. I am not advocating that we should permit each prisoner to determine whether the conditions of his imprisonment justify an escape. What I am saying is that when the facts presented, if believed, would establish the defense of coercion, then this defense should be available to a charge of escape.

3. It would be a fantasy to consider that defendant could have gained access to the courts during the few hours before the assault was to occur even had he so desired.