THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
HENRY BROWN, Appellant.

Second Department, June 18, 1979

APPEARANCES OF COUNSEL

*James S. Carroll, III (Gregory Traverse Crawford* of counsel), for appellant.

*Eugene Gold, District Attorney (Laurie Stein Hershey* of counsel), for respondent.

**OPINION OF THE COURT**

HOPKINS, J. P.

The defendant has been convicted of escape in the second degree. He claims that Criminal Term erroneously excluded evidence which he was prepared to submit in the form of testimony which would have substantiated his defenses of justification and duress. In short, the defendant argues that his evidence would have shown the escape was motivated because of threats on his life made by prison guards and other inmates, and because conditions in the prison were intolerable, thus vitiating the criminal intent which is an essential ingredient of the crime of escape in the second degree.

We affirm. The evidence tendered by the defendant would not have met the statutory standards established for the maintenance of the defenses of justification and duress, and Criminal Term was therefore correct in rejecting the proof.

I

On April 18, 1973 the defendant was committed to the Brooklyn House of Detention under an indictment charging him with murder. He had been brought to New York from Missouri where he had been serving a sentence of imprisonment for a term of 25 years for a conviction of assault with intent to kill. On September 27, 1973 the defendant was sent under guard to the Kings County Hospital for treatment of a possible ulcer. At the hospital the defendant was escorted to the X-ray department in the out-patient building.

The defendant's handcuffs were removed and the defendant undressed, donned a hospital gown and was X-rayed. He was then returned to the dressing booth. Hearing the door slam, the guards opened the booth to find the defendant gone. The guards were told that the defendant had been seen outside the building and gave chase. The pursuit was unsuccessful. The defendant was not apprehended until October 3, 1973.

The defendant was thereafter indicted for escape in the second degree.

## II

At the trial the defendant made several offers of proof. First, the defendant stated that Pedro Monges, a fellow prisoner, would testify that he had first met the defendant in the Brooklyn House of Detention and had heard the defendant's life threatened by prison guards on numerous occasions; that he knew that the defendant had gone to the hospital for medical treatment; and that the defendant had complained about pains in his chest caused by the threats.[1]

Second, the defendant stated that Paul Gulielmetti, a lawyer, would testify that he had acted as attorney for the plaintiffs in litigation involving conditions in the Brooklyn House of Detention, in which certain improvements had been directed by the court.[2]

1. The offer of proof was as follows: "Mr. Monges will testify to the fact that there were numerous threats made against Mr. Brown's life; that Mr. Monges first met Mr. Brown at around the time he was received into the Brooklyn House of Detention, around April 18th or thereabouts; that he was present while Correction Officers made numerous threats against Mr. Brown's life; that these threats continued up and until September 27th, 1973; that he had noted that Mr. Brown had gone to the hospital—or rather, I should say had gone for medical treatment on several occasions and that this was occasioned by the fact that Mr. Brown said he had pains in his chest and he complained about the—stating that these pains in the chest were caused by the numerous threats that were made. That's essentially what Mr. Monges will testify to. And of course, again, Your Honor, this goes to the whole issue of intent, which we have been trying to get the Court to—excuse me, to agree with. In other words, to agree with our position on the requisite intent in a criminal escape."

2. The offer of proof was as follows: "Your Honor, Mr. Gulielmetti is a member of a law firm. He's a practicing attorney. He's been practicing the law since his admission to the bar in 1973. He's presently a member of a firm. Mr. Gulielmetti had previously worked with legal services. He was one of the attorneys who brought the suit Wilson (phonetic) v Beam (phonetic). And he has been involved extensively in prison rights litigation. Mr. Gulielmetti particularly has been involved in the litigation with respect to the conditions in the Brooklyn House of Detention. The suit, Wilson v. Beame, deals with the conditions on the 10th floor of the Brooklyn House of Detention, where Mr. Brown is presently housed. And that suit was started back in 1973. Mr. Gulielmetti can also testify, and I was going to ask that he be qualified as an expert witness, that he can also testify to the fact that there are numerous law suits going on at this time, challenging the conditions in the Brooklyn House of Detention. Many of them have been successful. One particular lawsuit, Jenkins (phonetic), I forget—Jenkins case, I forget who the defendant was. On that particular case, in this Jenkins case, it was found that the conditions were unconstitutional and they deprived the defendant's standing—all ready to stand trial several constitutional rights. And an order was entered which was stated that the conditions are so bad that the Court ordered that inmates be housed one cell, rather than several to a cell, as they were previously housed. That's basically the essence of the testimony."

Third, the defendant stated that Stephen Lapimer,[3] a lawyer, would testify that he also had conducted litigation challenging conditions in the Brooklyn House of Detention, and that he had heard the Judge officiating in the litigation say that conditions in the prison were such as to lead to attempts to escape.[4]

Fourth, the defendant stated that Dan Pachoda, a lawyer, would testify that he had been associated with Mr. Gulielmetti in litigation relating to the Brooklyn House of Detention, some of which actions had been successful.[5]

Fifth, the defendant stated that Melvin Haywood, a lawyer, would testify that he had visited the Brooklyn House of Detention and was familiar with the actions in which conditions there had been challenged.[6]

Sixth, the defendant stated that Doctor Michael Smith, a psychiatrist, would testify that the effect of threats against an individual would result in personal stress, lowering the "individual's voluntariness with respect to his actions."[7]

---

**3.** The trial transcript indicated that the name was spelled "Lapimer"; the defendant's brief spells the name "Latimer".

**4.** The offer of proof reads as follows: "Mr. Lapimer's testimony is somewhat similar to Mr. Gulielmetti's. Mr. Lapimer is also a lawyer. He's been practicing law since 1968. He's presently working with Bronx Legal Services. Mr. Lapimer is or was the spear head in a suit which was commenced in 1972; also challenging conditions in the Brooklyn House of Detention. That suit was in the Federal Court and I think it was assigned to Judge Weinstein (phonetic). Mr. Lapimer can also testify to the fact that he has gone through the Brooklyn House of Detention on several occasions, with the Court, and that during the course of that lawsuit Judge Weinstein stated the conditions were so eronerous [sic] that they would in fact lead to escape, rather than discourage escape attempts. That's the essence of what Mr. Lapimer will testify to."

**5.** The offer of proof reads as follows: "The other witnesses' names, Dan Pachoda. Mr. Pachoda works at the Legal Aid Society, Prison Rights project. And Mr. Pachoda has also been involved in a lawsuit, Wilson v. Beame, along with Mr. Gulielmetti. He presently is spear head in that particular lawsuit. Mr. Gulielmetti is basically concerned in his private practice, at this point. And Mr. Pachoda has taken over that lawsuit. Mr. Pachoda could also testify to the conditions in the Brooklyn House of Detention and he can testify to several lawsuits that have been brought challenging the conditions in the Brooklyn House of Detention; some of them successful."

**6.** The offer of proof reads as follows: "Doctor Melvin Haywood is an attorney. He has a Doctorate of Jurisprudence. He works with a private law firm. Now he teaches law at Staten Island Community College and at Brooklyn College. He formerly was the head of the Community Defender at 1230 Fulton Street, which is a branch of the Legal Aid Society located in the Bedford-Stuyvesant area. He would have testified to his numerous visits to the Brooklyn House of Detention. He would have testified to his experience in the Court and he would have testified as to suits that have been brought challenging the jail conditions at the Brooklyn House of Detention."

**7.** The offer of proof reads as follows:

"Doctor Michael Smith was our second witness. He's a Psychiatrist. He's presently

The Criminal Term sustained the prosecution's objections to the offer of proof, holding that the proof was irrelevant to the issue of guilt. In effect, the court ruled that neither fear arising from threats nor intolerable prison conditions constituted defenses to the crime of escape.

The defendant, however, was permitted to introduce evidence through a doctor's testimony that the defendant was suffering from chronic gastritis and had suffered from peptic ulcers. The doctor further testified that stress was a contributing factor in the development of an ulcer. The defendant himself testified that in 1971 he had been treated for stomach ailments and had complained of an ulcer in 1972 while in prison in Missouri. He further testified that as a result of his complaints in New York he had seen the prison doctor and finally had been sent to Kings County Hospital for X-ray examination. He admitted that he had escaped from custody during the time of that medical procedure.

Criminal Term refused to admit testimony of the defendant under an offer of proof to the effect that the police officer assigned to bring the defendant from Missouri to New York had pointed his revolver at him on several occasions and told him that he did not deserve to live.[8]

The defendant excepted to the failure of the court to charge

---

from private practice. Doctor Smith would have testified as the effect of threats against an individual in terms of stress caused—personal stress caused in the individual and the lowering of the individual's voluntariness with respect to his actions.

"Those are the two witnesses that we had today. I was going to ask Doctor Smith a hypothetical question about threats made against Mr. Brown and what effect he feels that such threats might have had on Mr. Brown's volition in terms of his actions."

8. The offer of proof reads as follows: "Mr. Artason is a member of the Major Case Squad. I think Mr. Spadaro at least knows of him. He's been a central key figure in most of Mr. Brown's cases. Mr. Artason picked Mr. Brown up in St. Louis around April, I think, of 1973, escorted him from St. Louis to New York, first by car and then he took Mr. Brown on a plane. He was handcuffed to Mr. Brown on the way back from St. Louis to New York. On several occasions during that trip, Mr. Artason took his revolver out, pointed it at Mr. Brown's head, stated on several occasions that he was a cop killer and didn't deserve to live. On one occasion, when they were driving in St. Louis with several other officers in the car, an automobile came alongside of the car. Mr. Artason and the other officers thought that the automobile was in some way related to Mr. Brown. All of the officers withdrew their pistols, put their pistols next to Mr. Brown's head and again stated that he didn't deserve to live. When it turned out that the automobile was not in any way related to Mr. Brown, they put their pistols back in. Mr. Artason followed Mr. Brown's murder case and was transported back around April of 1973 from St. Louis. The murder trial, I think, took place, either the latter part of 1973 or the first part of 1974."

justification as a defense and specifically to the failure to charge that if the jury found that the defendant's escape was an effort to protect himself from imminent personal harm, then the jury should find that the defendant did not possess the criminal intent to commit the crime of escape.

## III

Section 35.05 of the Penal Law, so far as pertinent, reads:

"Unless otherwise limited by the ensuing provisions of this article defining justifiable use of physical force, conduct which would otherwise constitute an offense is justifiable and not criminal when: * * *

"2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue. The necessity and justifiability of such conduct may not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder. Whenever evidence relating to the defense of justification under this subdivision is offered by the defendant, the court shall rule as a matter of law whether the claimed facts and circumstances would, if established, constitute a defense."

This provision was derived from section 3.02 of the Model Penal Code and enters an area of criminal behavior not previously the subject of legislation in the law of New York. It is, as a commentator has said, a doctrine in substance recognizing and weighing a "choice of evils" presented by unusual situations "in which some compelling circumstance or 'emergency' warrants deviation from the general rule that transgression of the criminal law will not be tolerated" (Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law, § 35.05, p 83). To put it more concretely, the statute authorizes the defense of justification—or necessity, as it sometimes is called—in a limited number of cases where conduct otherwise condemned is found necessary as an emergency measure to avoid an imminent public or private injury about to occur through no fault of the actor, and the impend-

ing injury is of such gravity that the desirability and urgency of avoiding the injury clearly outweigh the objectives of the statute condemning the conduct (cf. *People v Bieniek,* 60 AD2d 777; *People v Brown,* 70 Misc 2d 224, 227-228 [BIRNS, J.]).

Whether conditions in a prison may ever justify a defense to the crime of escape is a question expressly left open by the Court of Appeals in *People v Barkman* (34 NY2d 624, 626). In *Barkman* the issue was not reached because the defendants had not made an offer of proof following a colloquy in which the trial court had said that it would not admit proof of conditions of the jail in support of a defense of justification. However, the Court of Appeals noted that the defendants had referred to the conditions only in general terms, without giving details or particulars concerning the conditions claimed to underlie and support the defense. Hence, the Court of Appeals held that "[w]ithout at least such a tender of proof we do not reach the question whether conditions or treatment in a correctional facility can ever constitute proof of justification as a defense to the crime of escape" *(People v Barkman, supra,* p 626).

IV

The existence and content of a defense of justification to the crime of escape have been discussed with varying conclusions in a steadily increasing incidence of cases. Certain States have held that intolerable prison conditions do not justify escape *(State v Palmer,* 45 Del 308; *State v Cahill,* 196 Iowa 486; *State v Alberigo,* 109 Ariz 294; *Coley v State,* 135 Ga App 810; *State v Boleyn,* 328 So 2d 95 [La]; *State v Green,* 470 SW2d 565 [Mo], cert den 405 US 1073). Other States have allowed the defense *(Cantrell v State,* 21 Ala App 558; *People v Lovercamp,* 43 Cal App 3d 823; *People v Unger,* 33 Ill App 3d 770, affd 66 Ill 2d 333; *People v Luther,* 394 Mich 619). Some States have not sanctioned the defense if mere threats on the life of the defendant are the basis of the claim, holding that the threats must be accompanied by immediate or imminent danger *(State v Milum,* 213 Kan 581; *Pittman v Commonwealth,* 512 SW2d 488 [Ky]; *State v Fitzgerald,* 14 Ore App 361; *State v Pearson,* 15 Utah 2d 353). Few Federal courts have considered the question, and most have not sustained the defense in the context of the circumstances presented in the particular case (see *United States v Boomer,* 571 F2d 543, cert

den *sub nom. Heft v United States,* 436 US 911; *United States v Michelson,* 559 F2d 567; *United States v Woodring,* 464 F2d 1248; *United States v Dempsey,* 283 F2d 934; but, see, *United States v Bailey,* 585 F2d 1087).

In *People v Lovercamp (supra)* the California Court of Appeals addressed the question at length. There the defendants offered proof that over a period of two and one-half months they had been sexually threatened, that a fight had ensued, and that after the fight the defendants had been told that their assailants would see them again. The defendants escaped from prison, but were promptly captured. The California court held that the defense must show the existence of these elements *(People v Lovercamp, supra,* pp 831-832):

"(1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the *immediate* future;

"(2) There is *no time for a complaint* to the authorities or there exists a history of futile complaints which make any result from such complaints illusory;

"(3) There is no time or opportunity to *resort to the courts;*

"(4) There is no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape; and

"(5) The prisoner *immediately reports to the proper authorities* when he has attained a position of safety from the immediate threat." (Emphasis supplied.)

The California court found that the offer of proof satisfied these conditions. In *United States v Michelson* (559 F2d 567, 569, 570, *supra)* the Court of Appeals for the Ninth Circuit did not adopt the principles of *Lovercamp.* Instead, the court focused on the necessity of the prisoner to return promptly to the custody of the law enforcement authorities, reasoning that even if imminent personal danger excuses escape, once the danger is remote, continued absence cannot be excused. In *United States v Bailey* (585 F2d 1087, *supra)* the Court of Appeals for the District of Columbia, by a divided vote, sustained the defense, even where the prisoner did not return to custody promptly.

## V

Whatever the merits of the *Lovercamp* analysis—and they appear to be considerable—our statute must be the final bench mark in assessing the defendant's conduct and his offer of

proof. In addressing the ultimate question of the validity of the defense of justification, we confront initially, whether, as broached under *People v Barkman* (34 NY2d 624, *supra*), section 35.05 of the Penal Law ever authorizes the defense in a prosecution for the crime of escape. Second, assuming that inquiry is answered affirmatively, we must then consider whether the defendant's offer of proof fell within the statute.

In examining the statute vis-à-vis the crime of escape, we observe at once that it is not limited in scope to particular criminal conduct, for the statute reads generally that "conduct which would otherwise constitute an offense is justifiable * * * when" (Penal Law, § 35.05). The thrust of the statute is rather directed toward a situation occurring through no fault of the defendant, and the desirability and urgency of avoiding an imminent public or private injury overbalance the desirability of avoiding the injury which is contemplated by a violation of the statute for which the defendant is being prosecuted. In a broad sense, then, we think that a defendant prosecuted for escape from a penal institution can raise the defense of justification if in fact the escape was compelled by the existence of conditions posing an imminent danger of personal injury to the prisoner, which cannot be avoided by the defendant through resort to the authorities or other legal means.

We entertain no doubt that a convict, punished by imprisonment for the commission of a crime, is under a continuing duty to serve his sentence without resort to disorder or surreptitious attempts to escape; and under our system of justice it is socially desirable that a person found guilty of a crime be incarcerated for the period of time set by law as a form of punishment for his misdeed. At the same time, our system recognizes that if the imprisonment imposed on the convict suffers the existence of conditions beyond the bounds of the law, so that the convict is subjected to brutal and intolerable measures or to the danger of imminent personal injury, either from the prison guards or from other inmates, without hope of relief after reasonable appeals to the authorities, then the prisoner may claim justification for an escape if he thereafter surrenders to custody within a reasonably prompt time, and the defendant's proof must be submitted to the jury. Brutality in the treatment of a prisoner is not sanctioned simply because the prisoner was sentenced to imprisonment for the commission of a crime.

Nonetheless, there are prescriptions in the statute which must be emphasized. It provides that imminent personal injury must be present before justification may be pleaded as a defense to a criminal act. Conditions in a prison may be crowded or unsanitary and yet not pose imminent danger to those confined. Relief from these conditions may be sought by the prisoner through appropriate legal action in the courts (see, e.g., *Wilkinson v Skinner,* 34 NY2d 53, 59; *Matter of Brabson v Wilkins,* 45 Misc 2d 286, mod 25 AD2d 610, affd 19 NY2d 433; *Commonwealth ex rel. Bryant v Hendrick,* 444 Pa 83; *Coffin v Reichard,* 143 F2d 443; cf. *Woodhous v Virginia,* 487 F2d 889; *Perez v Turner,* 462 F2d 1056, cert den 410 US 944; see, generally, Turner, When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts, 92 Harv L Rev 610). Indeed, the offer of proof made by the defendant included references to pending court proceedings concerning conditions in the institution where the defendant was confined. If, in contrast to the existence of unhealthful conditions generally in the prison, the prisoner's personal safety is threatened to the point of imminent injury and no other means of relief is reasonably available, the prisoner's escape to avoid the injury would constitute justification under the statute. Even in this extreme case, however, the prisoner should, as soon as possible, make known his presence and surrender to the law enforcement authorities *(United States v Michelson,* 559 F2d 567, 570, *supra).*

Having determined in the affirmative the initial query whether an escape under any circumstances may be justified, we turn to the second query whether the defendant's offer of proof in this case was sufficient. We think that it was not. In the first place, the defendant remained at liberty from September 27, 1973, the date of his escape, to October 3, 1973, when he was apprehended, without any endeavor by him to return to custody. Moreover, his escape was not from the prison but from a hospital where he was undergoing treatment for an ailment; at the time it is clear that he was not under any imminent danger of personal injury. Beyond this, his offer of proof of threats in prison by prison guards was not specific as to individuals making the threats or time; and the proof that a detective bringing him to New York had threatened his life did not establish imminent danger, as the threat allegedly occurred in April, 1973 and the escape occurred some five months later. The offer of proof relating to the

existence of litigation challenging the conditions in Brooklyn House of Detention could not serve as a ground justifying escape, since in itself such legal proceedings did not establish imminent danger to the defendant, but rather proved the existence and use of remedies to correct such conditions. Finally, the offer of proof of psychiatric testimony concerning pressure on an individual confined under unhealthful prison conditions to escape from prison in our judgment does not satisfy the tests which the defense of justification demands. It is the presence of intolerable conditions and threats of imminent danger which establishes the defense, and the defense of justification implies stress on the prisoner arising from those conditions, without the need of psychiatric testimony.

We find, therefore, that the defendant's offer of proof was properly excluded.

## VI

The defendant also urges that his escape was excused by duress. Our statute permits the defense of duress in the following language (Penal Law, § 40.00): "1. In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist."

We do not think that the circumstances of this case, even viewed in the light of the testimony offered to be proved, give rise to the defense of duress under the statute.[9] There was no physical force exercised on the defendant at the time of the escape, nor was there a threat of imminent use of physical force on the defendant at the time of the escape. The defendant fled from a hospital where he had gone to receive treatment. Duress in the sense of the statute means immediate physical force or immediate threat of physical force. It may not be used as a defense when the force or threat is incapable of immediate exercise of realization.

---

9. Some confusion arises in differentiating between the defense of duress and the defense of justification with respect to the crime of escape. Helpful discussions on this point appear in *United States v Michelson* (559 F2d 567, 570-571, *supra)* and in *United States v Bailey* (585 F2d 1087, 1096-1100, *supra).*

## VII

Consequently, we hold that the defendant's conviction must stand, and that Criminal Term was not in error in excluding the defendant's offer of proof.

SUOZZI, J. (dissenting). I vote to reverse the judgment of conviction and grant defendant a new trial.

I agree with so much of the majority opinion as holds that "a defendant prosecuted for escape from a penal institution can raise the defense of justification if in fact the escape was compelled by the existence of conditions posing an imminent danger of personal injury to the prisoner, which cannot be avoided by the defendant through resort to the authorities or other legal means."

However, I disagree with the majority's conclusion that defendant's offer of proof on the defense of justification was properly excluded as being insufficient as a matter of law.

As part of his offer of proof, defense counsel indicated that he would introduce testimony from a fellow inmate who was present when numerous threats were made on defendant's life by prison guards during the period commencing April 18, 1973, when defendant was committed to the Brooklyn House of Detention under an indictment charging him with murder, and September 27, 1973, when defendant was sent to Kings County Hospital (due to a possible ulcer), from whence he escaped on that very date.

In view of the fact, as the majority itself concedes, that an escape from prison may be justified in certain situations, it is clear that the defendant's offer of proof was of sufficient particularity to raise a genuine factual issue with regard to the defense of justification which could only be resolved upon submission to the jury.

COHALAN and MARGETT, JJ., concur with HOPKINS, J. P.; SUOZZI, J., dissents and votes to reverse the judgment and order a new trial, with an opinion.

Judgment of the Supreme Court, Kings County, rendered May 30, 1975, affirmed.