**STATE of Missouri, Respondent,**

**v.**

**Bryan Scott HADDIX, Appellant.**

**No. KCD 29586.**

Missouri Court of Appeals,
Kansas City District.

May 1, 1978.

---

Jerry W. Venters, Asst. Public Defender, Jefferson City, for appellant.

John D. Ashcroft, Atty. Gen., Carson Elliff, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., and DIXON and TURNAGE, JJ.

SOMERVILLE, Presiding Judge.

An information was filed on March 16, 1977, charging defendant, under the second offender act, with escape on February 12, 1975, from an auxiliary prison (Church Farm) under the control of the Missouri Department of Corrections in which he was lawfully confined. Defendant's incarceration at the Church Farm auxiliary prison stemmed from a six year sentence for first degree robbery out of Greene County, Missouri. A jury found defendant guilty of the escape charge and the trial court sentenced him to two years imprisonment, said sentence to run consecutively with the prior six year robbery sentence. Defendant timely appealed.

Defendant filed three pre-trial motions and made an extended offer of proof which merit mention because they are inextricably involved with three of the five points raised by defendant on appeal. A motion for "dismissal of counsel and appointment of new counsel", and a motion and a "renewed" motion "to quash information" comprise the referred to pre-trial motions. The latter two motions were filed, respectively, the day before trial and the morning of trial, and were directed primarily to defendant's claim that the state's delay in charging him with the escape offense until approximately one year after he was captured and returned to custody under the original sentence worked a "denial of due process of law and his right to a speedy trial". Conjunctively, it should be borne in mind that defendant's escape occurred on February 22, 1975, the Missouri Department of Corrections reobtained physical custody of him on January 22, 1976, from county authorities in Marion County, Indiana, thereafter approximately one year expired before a complaint was filed on January 6, 1977,

charging defendant with the escape offense, and defendant stood trial on the charge on April 14, 1977. The offer of proof heretofore referred to arose in a somewhat unorthodox fashion. On the morning of the trial, outside the hearing of the jury and prior to the presentment of any evidence, defense counsel advised the trial court that defendant was going to rely upon "necessity" as a defense to the escape charge in view of threatened homosexual attacks directed towards him by fellow inmates and, accordingly, he intended to present evidence to that effect. The state objected thereto and the trial court, in view of its familiarity with *State v. Green,* 470 S.W.2d 565 (Mo.banc 1971), advised defense counsel that under Missouri law "necessity" was not recognized as a viable defense to an escape charge and any effort to introduce evidence appertaining thereto would not be countenanced during the trial. The trial court's admonishment was scrupulously adhered to by defendant throughout the trial while in the presence of the jury. Defendant was, however, permitted to make the following offer of proof outside the presence of the jury. On February 22, 1975, defendant had been lawfully confined at Church Farm for approximately three weeks. Shortly after his transfer there "he was solicited by other inmates for homosexual favors, which he declined". On February 22, 1975, these other inmates, "whom he is even now fearful of identifying", threatened "that if he did not submit by that night they would kill him". The name of a fellow inmate was offered as a proposed witness who would confirm the homosexual advances and threats made upon defendant. It was reputed that Church Farm bore the "general reputation" of being an institution where an informant became a "marked man" if disciplinary action was taken against an inmate who was informed on and the only means of protection was to "lock up the informant for the balance of his sentence". Computationwise, the balance of defendant's robbery sentence did not expire until June of 1978. It was a

"matter of generally accepted understanding" among personnel of the Missouri Department of Corrections and the community at large in Cole County, Missouri, that the Missouri Department of Corrections was "incapable of fully protecting the inmates and indeed the personnel from the depravations of aggressive inmates, which proof would be corroborated by Warden Donald Wyrick himself, who had so stated in public and stated in the newspaper, in effect". At the time of the offense defendant was twenty-one years of age, five feet two inches tall, and weighed one hundred and ten pounds. Finally, by reason of the foregoing, "defendant had reason to believe and did believe that he was in immediate danger of death or serious bodily harm, and had reasonable cause to believe and did believe that it was necessary for him to act as he did by leaving the premises of the Auxiliary Prison in order to protect himself from such danger and that had he not been under such threat he would not have left the premises".

As defendant has not challenged the sufficiency of the evidence to sustain his conviction, a short, perfunctory statement of facts is deemed sufficient. Adverting to the state's evidence, the jury could have found beyond a reasonable doubt that on February 22, 1975, defendant was lawfully confined at the Church Farm auxiliary prison of the Missouri Department of Corrections by reason of having been convicted and sentenced in Greene County for violation of a felony statute, to-wit, first degree robbery. Further, defendant escaped and absconded from the Church Farm auxiliary prison on February 22, 1975, and remained at large and was not recaptured until January 22, 1976.

The points relied on by defendant on appeal, five in number, are as follows: (1) the trial court erred in summarily precluding defendant's proffered defense of "necessity" in light of his offer of proof; (2) the trial court erred in sua sponte eliciting production of an exhibit from one of the state's witnesses to bolster an essential element of the state's case as doing so deprived defendant of a "fair and impartial trial"; (3) the trial court erred in failing to make a "specific determination" as required by Sec. 556.280, RSMo 1969, that defendant had been convicted of a prior felony, and further erred in failing to hold a hearing outside the presence of the jury to determine the applicability vel non of Sec. 556.280, supra, the second offender act; (4) the trial court erred in not sustaining defendant's "renewed" motion "to quash information" because the state's delay in initiating the escape charge against him for almost a year following his apprehension constituted a "denial of due process" and "deprivation of a speedy trial"; and (5) the trial court erred in not sustaining defendant's motion for "dismissal of counsel and appointment of new counsel" as not doing so "forced . . [defendant] to go to trial with counsel not of his choosing in violation of his Sixth Amendment right to assistance of counsel".

■ In refusing to entertain the defense of "necessity", notwithstanding defendant's offer of proof, the trial court obviously relied on *State v. Green*, 470 S.W.2d 565 (Mo. banc 1971). The facts in *Green*, as gleaned from an offer of proof made therein, while similar in many respects to those represented by the offer of proof in the present case, were even more repugnant in other respects than those in the present case. The accused in *Green* had been attacked and sodomized under threats of death or great bodily harm at least twice before he escaped from the Missouri Department of Corrections. On two occasions the accused in *Green* feigned suicide and was removed to the hospital where he reported the homosexual assaults and asked to be relocated. Upon being moved to another wing, the accused was told by one authority that he would have to fight it out, submit to the homosexual assaults, or "go over the fence". On the day of his escape, the accused in *Green* was approached by a group of inmates and told that they would be at his cell that night and if he refused to submit to their homosexual desires they would either kill or inflict great bodily harm upon him.

In holding that the defense of necessity was unavailable in an escape case, the Supreme Court of Missouri, en banc, in *State v. Green*, supra, at p. 568, cited and relied on *People v. Richards*, 269 Cal.App.2d 768, 75 Cal.Rptr. 597, 604 (1969), for a concise definition of the defense of necessity: " 'The principle of justification by necessity, if applicable, involves a determination that "that harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged." * * * The compulsion from the harm or evil which the actor seeks to avoid, should be present and impending * * *.' " The Supreme Court of Missouri concluded in *Green* that under the accused's offer of proof the threats of homosexual abuse and bodily harm directed towards him were neither present, imminent, or impending as he "had several hours in which to consider and report these threats". 470 S.W.2d at 568. The Supreme Court of Missouri further elaborated on the unavailability of "necessity" as a defense by advancing the following as an additional reason for precluding its recognition: "Defendant's defense resolves itself into the simple proposition that the conditions of his confinement justified his escape. Generally, conditions of confinement do not justify escape and are not a defense." 470 S.W.2d at 568. This court is quick to acknowledge that it is bound to follow *State v. Green*, supra. Mo. Const., Art. V, § 2; and *Valentine v. State*, 541 S.W.2d 558 (Mo.banc 1976). Accordingly, defendant's first point is ruled adversely to him. In the event the Supreme Court of Missouri accepts this case on transfer and concludes to revisit *State v. Green,* supra, the following observations, albeit gratuitous, are respectfully set forth in connection with the availability of "necessity" as a defense in escape cases in other jurisdictions.

When *State v. Green*, supra, was decided it represented the majority, if not exclusive, point of view respecting escape cases. A silent, unspoken rationale appears to have prevailed at the time that legal recognition of "necessity" as a defense, even though generally urged in the context of threats of death or bodily harm directed toward an inmate for refusing to submit to homosexual advances of fellow inmates, would trigger a virtual flood of attempted escapes by reason of the simple expedient of relying upon spurious claims of homosexual advances as a defense. It was apparently deemed more socially acceptable to place total emphasis on maintaining the integrity of prison security systems than to risk affording even the slightest measure of human dignity to prisoners subjected to loathsome and depraved sexual attacks from fellow prisoners. This raises a serious question of whether an abused prisoner must wait for penological reforms as his only means of relief—which may come too late. To say that conditions of confinement do not justify an escape and that "necessity" must unequivocally go unrecognized as a defense in escape cases, regardless of the loathsome, demeaning and perverse nature of threatened abuses directed towards an escapee, borders on admitting the existence of a wrong for which there is no remedy. It is difficult to placidly accept such an unsatisfactory conclusion. Although a convicted felon forfeits his liberty, he surely does not forfeit all semblance of human dignity and relinquish even the most basic of personal rights to which men in their innate sense of justice feel every man is entitled. The cry of wholesale attempts of escape spurred by fallacious claims of homosexual advances, if "necessity" is recognized as a defense, deprecates the ability of the trier of the fact to separate the truth from the untruth. It is an indictment of the right of trial itself, whether by court or jury.

The barrier of resistance towards "necessity" as a recognized defense in escape cases was pierced by the advent of *People v. Harmon*, 53 Mich.App. 482, 220 N.W.2d 212 (1974), affirmed 394 Mich. 625, 232 N.W.2d 187 (1975). Denominating the defense as "duress", the court in *Harmon* recognized it as a viable defense in escape cases actuated by threats of death or violence to an escapee who refused to permit fellow inmates to take homosexual license with him, if the

escapee established that his escape "was necessitated by threatening conduct of another which resulted in defendant harboring a reasonable fear of imminent or immediate death or severe bodily harm". 220 N.W.2d at 214. The *Harmon* court carefully pointed out that whether threats of death or serious bodily harm feared by an escapee were "imminent or immediate", so as to invoke the defense of "duress" or "necessity", was, in all but the clearest cases, "to be decided by the trier of fact taking into consideration all the surrounding circumstances, including the defendant's opportunity and ability to avoid the feared harm." 220 N.W.2d at 214. Stated in simpler terms, the *Harmon* court appears to have recognized that threats of death or violence to be consummated within a few hours or even a few days against one whose freedom of movement is limited and restricted by incarceration in a penal institution might well meet the test of being "imminent or immediate" even though a different result might be dictated regarding one outside the confines of a penal institution whose freedom of movement, in the context under discussion, is unlimited and unrestricted. The *Harmon* court placed great reliance on the ability of the trier of fact to sift the truth from the untruth and focused on whether evidence existed from which the trier of fact could find that the escapee reasonably harbored a fear of "imminent or immediate death or serious bodily harm" if he remained in confinement and refused to submit to the debasing demands of fellow inmates.

*Harmon* was quickly followed in Michigan by *People v. Luther*, 394 Mich. 619, 232 N.W.2d 184 (1975), involving homosexual demands made upon an escapee, and *People v. Hocquard*, 64 Mich.App. 331, 236 N.W.2d 72 (1975), involving denial of an escapee's request for medical care. The court in *Hocquard* held that the defense of necessity in escape cases was tightly circumscribed and inapplicable absent "a prima facie showing of evidence to support each and every one" of five enumerated elements or conditions. *People v. Lovercamp*, 43 Cal.App.3d 823, 118 Cal.Rptr. 110 (1974), decided in the in-

terim between *People v. Harmon*, supra, and *People v. Hocquard*, supra, sanctioned a "limited" defense of "necessity" in escape cases if evidence was presented to support the existence of five "conditions". The court in *Lovercamp* departed from *People v. Richards*, 269 Cal.App.2d 768, 75 Cal. Rptr. 597 (1969), which had disallowed the defense of "necessity" in an escape case, and which was cited and relied upon by the Supreme Court of Missouri in *State v. Green* supra, on the basis of certain "oblique dicta" contained in *Richards*. The five "conditions" laid down in *Lovercamp*, 118 Cal.Rptr. at 115, as requisites for invoking the "limited" defense of "necessity", are as follows: "(1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory; (3) There is no time or opportunity to resort to the courts; (4) There is no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape; and (5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat."

The five "elements" or "conditions" enunciated by the Michigan Court of Appeals in *People v. Hocquard*, supra, were, with one exception, identical to those set forth by the California Court of Appeals in *People v. Lovercamp*, supra. The Michigan Court of Appeals in *People v. Hocquard*, supra, substituted the following for the first "condition" set out in *People v. Lovercamp*, supra: "The compulsion must be present, imminent and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done. A threat of future injury is not enough." 236 N.W.2d at 75.

Although Michigan appears to have retrenched somewhat from its earlier holding in *People v. Harmon*, supra, by reason of the influence of *People v. Lovercamp*, supra, a recent Illinois decision takes the op-

posite tack. In *People v. Unger*, 66 Ill.2d 333, 5 Ill.Dec. 848, 362 N.E.2d 319 (1977), the Supreme Court of Illinois held that evidence adduced by an escapee that he fled confinement after being assaulted and sexually molested by other inmates, and after receiving an unidentified telephone call threatening him with death for reporting the matter to prison authorities, raised the statutory defense of "necessity".[1] The Supreme Court of Illinois in *Unger*, although agreeing that the five "conditions" set forth in *People v. Lovercamp* (118 Cal.Rptr. 110), supra, were relevant factors in assessing claims of necessity in the sense that their existence or non-existence went to the "weight and credibility" of an escapee's testimony that his escape was solely motivated by necessity, specifically rejected the notion that availability of the defense of necessity was "expressly conditioned upon the elements set forth in *Lovercamp*". 5 Ill.Dec. at 852, 362 N.E.2d at 323. The Supreme Court of Illinois adopted a more expansive view of the defense of necessity in escape cases and in doing so was obviously influenced by the fact that non-compliance by an escapee with certain "conditions" laid down in *Lovercamp* (118 Cal.Rptr. 110) was not necessarily inconsistent with a claim that necessity was the sole motivating factor for effecting an escape.

Three other jurisdictions have recently recognized some form of necessity as a defense in escape cases. See: *Lewis v. State*, 318 So.2d 529 (Fla.App.1975); *State v. Boleyn*, 328 So.2d 95 (La.1976); and *State v. Worley*, 265 S.C. 551, 220 S.E.2d 242 (1975).

Defendant's second point attributes error to the trial court for having sua sponte elicited production of an exhibit from one of the state's witnesses to bolster an essential element of the state's case. Its genesis is an unorthodox occurrence which took place during direct examination of one of the state's witnesses. Harry Lauf, records' custodian of the Missouri Department of Corrections, identified certain exhibits which were admitted into evidence for the purpose of showing that defendant was lawfully confined in an institution under the control of the Missouri Department of Corrections on the date of his escape. The trial judge apparently harbored some qualms as to whether the exhibits adequately showed that defendant was "housed" at the Church Farm auxiliary prison on the crucial date in question. As a consequence of this nagging doubt in the mind of the trial judge, the following colloquy occurred in the presence of the jury:

"THE COURT: Do you have any document in the file that would indicate where the defendant was housed on any given day?

THE WITNESS [Harry Lauf]: I have another document that states wherein he was reassigned from Church Farm to MSP.

THE COURT: You say you maintain all the records. Is there anything you have that you can go to that would tell this jury where this man was housed?

THE WITNESS: I have the chronological data sheet.

THE COURT: Would you take that out.

THE WITNESS: I have it in my briefcase. I don't have it with me.

THE COURT: Go get it. I want to take a look at it.

MR. DAWDY [Assistant Prosecuting Attorney]: As to your questions, I believe State's Exhibit 4 answers.

THE COURT: I assure you State's Exhibit 4 does not answer it clearly in my mind, and I may put it in as a court exhibit.

MR. McFADDEN [Counsel for defendant]: I would like to make an objection to the Court supplying an essential element of the proof of the case for the state. If the state—

---

1. Ill.Rev.Stat.1971, Ch. 38, par. 7–13 "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was · without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct."

THE COURT: Mr. McFadden, it's the function of this Court to see that justice is done and I am not going to sit here and see justice not done.

MR. McFADDEN: It's an adversary proceeding.

THE COURT: I am aware of that. The state is due a fair trial and you are doing the best you can. I want to look at this document. I haven't read it to the jury. I want to satisfy my own mind.

MR. McFADDEN: I have made an objection.

THE COURT: You move for a mistrial?

MR. McFADDEN: No, because no evidence has gone in. I am objecting to your making the interrogation.

THE COURT: I understand.

MR. McFADDEN: Do you overrule it?

THE COURT: Overruled.

[The document was produced for the Court.]

THE COURT: Thank you. That is all I need. I don't have any further questions of Mr. Lauf."

The "chronological data sheet" referred to was never offered or admitted into evidence, nor was its contents otherwise made known to the jury.

 The first and foremost duty of a trial judge is to both be and appear to be an impartial arbiter. Anything done during the course of a trial which damages that image makes the entire trial suspect. Proof that defendant escaped from a "state institution in which he was lawfully confined" on February 22, 1975, the date of his escape, was an essential element of the state's case. Sec. 557.351, RSMo Supp.1971. See also *State v. Croney*, 425 S.W.2d 65, 67 (Mo. 1968). As previously indicated, the trial court apparently possessed some pangs of doubt, even though misplaced, as to whether the state's evidence showed that defendant was lawfully confined at Church Farm auxiliary prison on February 22, 1975, the date of his escape. The ensuing colloquy was initiated by the trial judge to allay his doubts concerning this essential element of the state's case. The strongest, the most immediate, and the most lasting impressions garnered from the colloquy are (1) that the trial judge satisfied himself from his perusal of the "chronological data sheet" that the defendant was lawfully confined at the Church Farm auxiliary prison on the date of his escape; and (2) that the concluding remarks made by the trial judge in the presence of the jury, "[t]hat is all I need. I don't have any further questions of Mr. Lauf", particularly in view of the context in which they were uttered, intemperately commented on the sufficiency of the state's evidence as to an essential element of its case even though the exhibit itself was never made available to the jury, and strongly suggested that defendant's guilt of the offense for which he was standing trial was a foregone conclusion. At the very least, the conduct and remarks of the trial judge conveyed the appearance of bias in favor of the state. As held in *State v. Jones*, 197 S.W. 156, 158 (Mo.1917), "[t]he law so jealously guards the rights of a defendant, on trial for his liberty, that a trial judge should avoid any indication of feeling against the prisoner; an indication of his belief in defendant's guilt might determine the verdict." Bringing the matter into even sharper focus, as eloquently stated by Judge Learned Hand in *United States v. Marzano*, 149 F.2d 923, 926 (C.C.A.2d 1945), a trial judge "must not take on the role of a partisan; he must not enter the lists; he must not by his ardor induce the jury to join in a hue and cry against the accused . . . [p]rosecution and judgment are two quite separate functions in the administration of justice; they must not merge." Whether an accused was afforded a fair and impartial trial, *State v. Hill*, 518 S.W.2d 682, 685 (Mo.App.1975), is the ultimate test for determining whether a trial judge merely went up to as opposed to going beyond the brink in his conduct of the trial. These are misty words, "a fair and impartial trial", but they are more than a shibboleth and when firmly ensconced in a system of jurisprudence, as in our own, they profoundly shape the ultimate course of justice in given instances. Scrupulously avoiding

any intention of impinging upon or minimizing the right of a trial judge to interrogate witnesses in a proper manner at appropriate times,[2] this court concludes that the complained of conduct of the trial judge in the instant case, all within the presence and hearing of the jury, deprived defendant of that most basic of rights, "a fair and impartial trial".

Defendant's third point conjoins two distinct grounds of alleged error—(1) failure on the part of the trial court to make a "specific determination", as required by Sec. 556.280, RSMo 1969, the second offender act, that defendant had been convicted of a prior felony, and (2) failure on the part of the trial court to hold a hearing outside the presence of the jury to determine the applicability vel non of Sec. 556.280, supra. Having determined that the judgment below must be reversed and the cause remanded for a new trial by reason of the error complained of by defendant in his second point, no useful purpose would be served by writing at length upon and formally disposing of defendant's third point.

Defendant's fourth point attacks the allegedly inordinate delay between his apprehension following escape (January 22, 1976) and the filing of formal criminal charges for the escape (January 6, 1977). If persuasive, it would entitle defendant to outright acquittal as opposed to mere reversal and remand for a new trial, and for this reason must be justiciably disposed of and ruled on. Defendant submits that the unexplained delay that occurred between the date he was apprehended and the date formal charges were filed offended his constitutional right of "due process" by depriving him of a "speedy trial" as guaranteed by the Sixth Amendment to the Constitution of the United States.

The "speedy trial" provision of the Sixth Amendment to the Constitution of the United States is applicable to state court proceedings by reason of the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Although the Sixth Amendment guarantee of a "speedy trial" does not ordinarily attach until after an indictment or formal charge is filed, it may also be engaged by arrest and confinement to answer a criminal charge. *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 479 (1971). A threefold policy underlies the constitutionally guaranteed right of a speedy trial—(1) prevention of undue and oppressive incarceration prior to trial, (2) minimization of the anxiety and concern accompanying public accusation, and (3) limitation of the possibility of impairing an accused's ability to defend himself. *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); and *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). According to defendant, a composite of the above principles, when overlaid on the facts of this case, convincingly demonstrates that he was denied a "speedy trial" in the constitutional sense. Factually, there is a glaring, fatal breach in defendant's position. When Missouri authorities picked defendant up in Indiana on January 22, 1976, and returned him to the Missouri Department of Corrections, they did so under authority of his uncompleted term of confinement in connection with his conviction and sentence out of Greene County, Missouri, for first degree robbery. Moreover, defendant was still serving time for his conviction and sentence out of Greene County, Missouri, both on January 6, 1977, the date the complaint charging him with the escape offense was filed, and on April 14, 1977, the date he went to trial on the escape charge. Consequently, defendant cannot be said to have been unduly or oppressively incarcerated prior to trial or subjected to undue anxiety or concern accompanying public accusation with reference to the escape charge. Nor is defendant in any position to complain that the ensuing delay between January 22, 1976, the date he was returned to custody of the Missouri Department of Corrections following his escape, and January 6, 1977,

---

**2.** See: *State v. Farmer*, 536 S.W.2d 748 (Mo. App.1976); *State v. Clark*, 522 S.W.2d 332 (Mo. App.1975); and *State v. Pearson*, 519 S.W.2d 354 (Mo.App.1975).

the date a formal complaint was filed charging him with the escape offense, was prejudicial by reason of impairing his defense to the escape charge. During a hearing conducted in connection with defendant's "renewed" motion "to quash information", the only claim of prejudice made by defendant in connection with the delay in filing the formal charge against him was that certain witnesses whose testimony was pertinent to his proposed defense of "necessity" were no longer available. Assuming, arguendo, that the complained of delay resulted in the unavailability of certain witnesses who defendant proposed to call with reference to his proposed defense of "necessity", no prejudice inured to defendant by reason thereof because reliance upon the proposed defense of "necessity" was forestalled by *State v. Green*, supra. In view of the totality of the circumstances presented, defendant's claim that the unexplained, inordinate delay in filing formal charges against him violated his constitutionally guaranteed right of a "speedy trial" is not well taken.

 Defendant's final point deals with the trial court's refusal to sustain his motion for "dismissal of counsel and appointment of new counsel". Having failed to raise or mention any alleged error attached thereto in his motion for a new trial, defendant's final point is abortive and preserves nothing for appellate review. Defendant's request that it be reviewed as "plain error" under Rule 27.20(c) is unaccompanied by any convincing demonstra-

tion that a failure to do so will result in "manifest injustice" or work a "miscarriage of justice". Briefly, defendant was represented by appointed counsel, the Public Defender of Cole County. His sole complaint on appeal is that he was "forced . . . to go to trial with counsel not of his own choosing in violation of his Sixth Amendment right to assistance of counsel". An accused's Sixth Amendment right of assistance of counsel does not mean that he has an absolute right to the service of a particular attorney. *State v. Jefferies*, 504 S.W.2d 6 (Mo.1974); *State v. Williams*, 419 S.W.2d 49 (Mo.1967); and *State v. Wade*, 535 S.W.2d 492 (Mo.App.1976). Defendant makes no mention on appeal of any instance of ineptness or ineffectiveness on the part of present counsel. Nor has he ever contended that he asserted and was denied the right to serve as his own attorney so as to bring himself within the ambit of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Defendant's fifth point fails to create any avenue for appellate relief.

Judgment reversed and cause remanded for a new trial.

All concur.