STATE of Missouri,
Plaintiff-Respondent,

v.

Gary Lynn BAKER, Defendant-Appellant.

No. KCD 30110.

Missouri Court of Appeals,
Western District.

April 7, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 5, 1980.

Application to Transfer Denied
June 10, 1980.

Clyde E. Rogers, Public Defender, Fourteenth Judicial Circuit, Moberly, for defendant-appellant.

John Ashcroft, Atty. Gen., Steven Scott Clark, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

DIXON, Judge.

Defendant appeals his conviction for escape from a state institution. Defendant was sentenced to serve a five-year term for the offense of felonious stealing. Defendant was received at the Missouri State Penitentiary at Jefferson City and later transferred to the Missouri Training Center for Men at Moberly, Missouri.

The single and dispositive issue in the case is the defendant's claim that the trial court erred in refusing his offer of proof and refusing to give an instruction on the defense of necessity to the charge of escape.

On October 3, 1976, the defendant-prisoner and another inmate removed bricks from a wall in a building at the training center where they were assigned to work, crawled into a dining room and then through a window to the outside of the institution. They caught a ride to Kansas City, and on October 5, 1976, at 9:30 a. m., they were arrested in a hotel in North Kansas City. There was no violence connected either with the escape nor with the subsequent arrest.

Defendant was charged with escape from custody pursuant to § 557.351 RSMo Supp. 1975 (now §§ 575.200, 575.210, and 575.230 RSMo 1978), tried by a jury in Boone County on change of venue, found guilty of escape, and sentenced to a term of two years.

During the course of the trial, defendant attempted to present evidence of an affirmative defense of "necessity" to the escape charge. The trial court sustained the State's objection when defendant first attempted to offer this evidence, and defense counsel then made an extensive offer of proof. Some of the offer consisted of testimony out of the hearing of the jury. A portion of the offer was by a narrative statement by counsel of the evidence that would be forthcoming. Prior to these narrative offers, the court and counsel engaged in a colloquy concerning the proposed offer. The State does not question the validity of the offer. The manner and content of the offer of proof have been examined, and the offer conforms to the requirements necessary to preserve for review the evidence offered. *Stipp v. Tsutomi Karasawa*, 318 S.W.2d 172, 175 (Mo.1958); *Merk v. St. Louis Public Service Company*, 299 S.W.2d 446, 449 (Mo.1957). Thus, for the purpose of review of the defendant's contention, the proffered evidence is taken as true and credible, and the issue of its admission becomes one of whether such evidence taken as true is admissible under the theory offered and the further question of whether the evidence would have supported a submission to the jury of the defense of necessity.

The offers of proof summarized and shorn of evidentiary detail would have established the following facts:

Defendant had, on numerous occasions, been threatened with physical violence by a group of inmates in an attempt by them to get him to submit to homosexual relationships with members of this group. One such threat came in the form of a death threat note delivered to defendant shortly prior to his escape. Actual violence was inflicted upon the defendant by this group on two or more occasions, resulting in at least one instance of a laceration sufficient to require five stitches. Defendant had made several unsuccessful requests to the administration to be placed in protective custody due to these specific problems. At least one of these requests for assistance was in writing. When asked to provide the names of his attackers he could only say he had heard one called "Red Dog." No force or violence was used in the defendant's escape nor when he was recaptured. While he was at large, defendant called Superintendent White of the Center and offered to surrender himself if defendant was given some protection. The defendant returned to the area of his home, contacted his parents, and had no intent by his departure to avoid service of his prison term.

The threshold question in this case is the availability of the defense of necessity in the law of Missouri. The issue is of only transient importance since the Legislature has, by the enactment of §§ 562.071 and 563.026 RSMo 1978, recognized the affirmative defenses of coercion and necessity. The posture of the instant case requires that the availability of necessity as a defense under the common law of Missouri, as it existed on the date of defendant's trial, be determined.

The State contents itself on this issue by citing *State v. Green*, 470 S.W.2d 565 (Mo. banc 1971), and *State v. Haddix*, 566 S.W.2d 266 (Mo.App.1978), asserting that these cases categorically deny the availability of the defense of necessity. Superficially, these cases can be so read, but close analysis makes the question much more doubtful.

Looking first to *Haddix,* an opinion of this court written by Judge Somerville and joined in by this writer, a conviction was reversed and remanded for a new trial because of an incident at trial which was held to have deprived the defendant of a "fair and impartial trial." *Haddix,* 566 S.W.2d at 274.

The discussion and ruling with respect to *Green, supra,* contained in *Haddix* must be considered in the context of that case. The position of the defendant in *Haddix* was that *Green* was in error and should be re-examined. An excerpt from the defendant's brief in *Haddix* unequivocally demonstrates this was the posture of the case:

"Appellant concedes that the Missouri Supreme Court considered this very question in *State v. Green,* 470 S.W.2d 565 (Mo. banc 1971), *cert. denied,* 405 U.S. 1073, 31 L.Ed.2d 806, 92 S.Ct. 1491 (1972), and held that the defense of necessity was not available to the defendant and that the trial court did not err in excluding his offer of proof to that effect. . . Appellant submits . . . , a re-examination of the *Green* case is in order." Appellant's brief, pp. 12–13, *Haddix, supra.*

In view of that concession by counsel, the court in *Haddix* was not focusing on the limits of the *Green* case but on the request that it be re-examined. The *Haddix* opinion initially points out that the facts in *Green* were much more "repugnant" than those in *Haddix,* and that the holding in *Green* was "that the defense of necessity was unavailable in an escape case." *Haddix* then invited reconsideration of *Green* and reviewed extensively the more recent comment and authority on the defense of necessity.

Reviewing *Green* and the authority cited in *Haddix* in the light of the facts of *Haddix,* it is clear that the determination in *Haddix* was upon a factual basis. The thrust of *Haddix* and of *Green* is that conditions of servitude do not *justify escape.* Whatever may have been said in *Haddix* as to the meaning of *Green,* the instant case requires, as *Haddix* did not, that this court

determine whether *Green* holds that the defense of necessity is categorically unavailable.

Turning to *Green,* the court there was considering a case where several of the classic elements of the defense of necessity were lacking—immediate danger and complaint to authority. The defendant's claim was predicated upon extensive proof of general prison conditions. There can be no question that in *Green* the prisoner sought to bottom the defense on the ground that the conditions of confinement were unconstitutional, and thus, the issue was not purely one of the defense of necessity. The following excerpt from the majority opinion in *Green* makes this clear:

"In his printed argument, defendant states quite candidly that the alleged unwholesome and unconstitutional conditions, *in themselves alone,* would not justify his escape; that '[t]he needs for security and discipline in the corrections system are such that it would be folly to create a defense for any prisoner who escaped the system because he thought he was being held under unconstitutional or unwholesome conditions.' His position is that these conditions '. . . *combined with* one or both of two *other* factors do justify his escape . . .' and that the other factors are '. . .' [1] *denial by the State of the access to the courts* for redress of the unconstitutional conditions . . . [and] . . . [2] the *necessity* under those unconstitutional conditions to escape as the only means of protecting himself . . .'" *State v. Green, supra* at 567.

The *Green* court then analyzed the factual background and concluded the evidence did not support the claim. The opinion gave a definition of the defense drawn from *People v. Richards,* 269 Cal.App.2d 768, 75 Cal.Rptr. 597 (1969), and said:

"This is not a case where defendant escaped while being closely pursued by those who sought by threat of death or bodily harm to have him submit to sodomy. Moreover, the threatened consequences of his refusal to submit could

have been avoided that day by reporting the threats and the names of those making the threats to the authorities in charge of the Center. Defendant had several hours in which to consider and report these threats." *State v. Green, supra* at 568.

*Green,* thus, is not authority for the proposition that the defense of necessity is unavailable under appropriate proof in a Missouri prison escape case. *Green* noted that no Missouri authority has established the defense as a part of the common law of Missouri. One commentator has also observed that the *Green* court did implicitly recognize necessity as a defense to escape because its reason for rejecting the defense was that the danger was not sufficiently close at hand the the consequences of the threats made could have been avoided by other means. (*Note* Prisons-Escape-Necessity As A Defense, 37 Mo.L.Rev. 550, 559–560 (1972)). It must be concluded that the question is an open one to which this court may address itself.

Although there are historical and technical differences between "necessity," "coercion," and "duress," there has been a great deal of confusion in the treatment of these defenses in both the case law and in writings on the subject. There is functionally little difference among necessity, coercion, and duress due to the courts' failure to consistently impose the same requirements on each defense. The dissent in *Green* referred to an earlier Missouri case stating the requirements for coercion; *State v. St. Clair,* 262 S.W.2d 25, 27, 40 A.L.R.2d 903 (Mo.1953). The commentary referred to concludes that the terms, duress and necessity, are functionally synonymous. *Note, supra* at 553.

This analysis is supported in the recent United States Supreme Court case, *United States v. Bailey et al.,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980):

"Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. . . .

Modern cases have tended to blur the distinction between duress and necessity." *Id.* at 634.

Oceans of ink have been spilled by the legal logicians in an attempt to pigeonhole the defense in common law categories of justification or excuse or as the defense relates to the act or the state of mind of the defendant. Those interested in such web spinning may consult: Gardner, The Defense of Necessity and the Right to Escape from Prison—A Step Towards Incarceration Free from Sexual Assault, 49 So.Cal.L. Rev. 110 (1975); and Note, Duress and The Prison Escape: A New Use For An Old Defense, 45 So.Cal.L.Rev. 1062 (1972); Prison Escape and Defenses Based on Conditions: A Theory of Social Preference, 67 Cal.L.Rev. 1183 (1979). *United States v. Bailey,* 585 F.2d 1087 (D.C.Cir.1978), contains an exhaustive review of the case law and the commentary.

*Bailey,* at the circuit court level, attempted a rationale based on intent and general policy considerations. The Supreme Court rejected the intent analysis, recognized the defense, and held it was unavailable to those defendants because of a *total failure* of proof of the element of an offer of surrender after escape.

Justice Rehnquist, in *Bailey, supra,* 100 S.Ct. at 634, speaking for the majority, recognized the defenses as statements of legal policy underlying the traditional defenses:

"[T]he defenses were designed to spare a person from punishment if he acted 'under threats or conditions that a person of ordinary firmness would have been unable to resist,' or if he reasonably believed that criminal action 'was necessary

to avoid a harm more serious than that sought to be prevented by the statute defining the offense.' "

The Model Penal Code, the new Missouri Criminal Code, and case law from other jurisdictions define the contours of the defense. A thorough accounting of that development can be found in an annotation of *People v. Lovercamp*, 43 Cal.App.3d 823, 118 Cal.Rptr. 110, at 69 A.L.R.3d 668 (1974), in *Haddix, supra* at 270–272, and by a perusal of Model Penal Code §§ 2.09, 3.02 (Prop. Off. Draft, 1962) and comments thereto. A complete repetition of those materials is unnecessary, but a brief synopsis is pertinent.

The affirmative defenses of duress and necessity are now reflected in Missouri statutory law at §§ 562.071 and 563.026 RSMo 1978. Section 563.026 is particularly relevant to the issue being discussed here, since that statute provides, under the rubric of justification, the defense of necessity. It involves a balancing test to be applied by ordinary standards of intelligence and morality to the desirability of avoiding the injury threatened to the public or private right against the injury sought to be prevented by the criminal act to which the defense is directed.

*Haddix, supra*, states the barrier of resistance towards "necessity" as a recognized defense in escape cases was pierced by *People v. Harmon*, 53 Mich.App. 482, 220 N.W.2d 212 (1974), aff'd 394 Mich. 625, 232 N.W.2d 187 (1975). There, duress was recognized as a defense to escape to a defendant threatened with homosexual attacks if he could show his escape "was necessitated by threatening conduct of another which resulted in defendant harboring a reasonable fear of imminent or immediate death or severe bodily harm." 220 N.W.2d at 214. The Michigan court placed great faith in the ability of the trier of fact to sift the truth from the untruth and determine whether the threats feared by defendant were imminent or immediate and whether defendant had the opportunity and ability to avoid the feared harm. *Haddix* recognizes that a defendant's confinement may

change the definition of "imminent and immediate" when it says:

"Stated in simpler terms, the *Harmon* court appears to have recognized that threats of death or violence to be consummated within a few hours or even a few days against one whose freedom of movement is limited and restricted by incarceration in a penal institution might well meet the test of being 'imminent or immediate' even though a different result might be dictated regarding one outside the confines of a penal institution whose freedom of movement, in the context under discussion, is unlimited and unrestricted." 566 S.W.2d at 271.

*Harmon* was followed in *People v. Luther*, 394 Mich. 619, 232 N.W.2d 184 (1975) which also involved homosexual demands against the defendant escapee.

*Lovercamp, supra*, is a more recent California case which departs dramatically from the earlier California law of *Richards, supra*. In *Lovercamp*, a limited defense of necessity was sanctioned in escape cases if five evidentiary conditions were supported:

"(1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;

(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory;

(3) There is no time or opportunity to resort to the courts;

(4) There is no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape; and

(5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat." 118 Cal.Rptr. at 115.

Similar conditions were enunciated in Michigan in *People v. Hocquard*, 64 Mich. App. 331, 236 N.W.2d 72 (1975) except that condition number 1 was changed to read:

"The compulsion must be present, imminent and impending, and of such a nature

as to induce a well-grounded apprehension of death or serious bodily harm if the act is not done. A threat of future injury is not enough." *Id.* at 337, 236 N.W.2d at 75.

The Illinois case of *People v. Unger,* 66 Ill.2d 333, 5 Ill.Dec. 848, 362 N.E.2d 319 (1977), rejected the idea that the defense of necessity was expressly conditioned upon the *Lovercamp* elements and took a more expansive view of the defense. The statutory defense of necessity (Ill.Rev.Stat.1971, Ch. 38 § 7–13) was considered raised when the defendant-escapee produced evidence to show that he escaped after assaults and sexual molestation by other inmates and receipt of a telephone death threat from an unidentified caller for reporting the incidents to prison authorities. The court made the point that noncompliance with the *Lovercamp* conditions was not necessarily inconsistent with a claim of necessity as the sole motivation for an escape. This opinion from the Supreme Court of Illinois necessarily removes the *Hocquard* view of denying the defense on facts showing a threat of future injury from the law of Illinois. For similar views see: *Esquibel v. State,* 91 N.M. 498, 576 P.2d 1129, and *Note,* Duress and The Prison Escape: A New Use For An Old Defense, *supra.*

Other jurisdictions have also recognized some form of necessity as a defense to escape: *Lewis v. State,* 318 So.2d 529 (Fla. App.1975); *State v. Boleyn,* 328 So.2d 95 (La.1976); *State v. Worley,* 265 S.C. 551, 220 S.E.2d 242 (1975) and *Pittman v. Commonwealth,* 512 S.W.2d 488 (Ky.1974). Other cases are discussed in the annotation to *Lovercamp, supra,* entitled Prison Escape—Justification, 69 A.L.R.3d 678, and pocket parts. It must be conceded that the case law and commentary establish a common law affirmative defense of necessity and no impediment appears to prevent its adoption as the common law of Missouri. Drawing from these sources, the following factors appear to be important in the evidentiary matrix surrounding the defense:

1) a present and imminent danger, the definition of danger being based upon the facts of a defendant's confinement and the imminence of the danger not being solely based on a time interval but upon the entire fact situation;

2) exhaustion of remedies or evidence that attempts to do so had been futile and that the imminence of danger of threatened harm is such that no alternative is available;

3) evidence that the escapee did not use force or violence against innocent persons in perfecting the escape;

4) and a duty on the part of the escapee to surrender when the threatened danger has been avoided.

This review indicates the defense has been recognized in various forms. Our own statute, § 563.026 RSMo 1978, recognizes the defense and represents an expression of the public policy of this state. The immediate task is the analysis of the nature of the defense and its elements in the light of the practice and procedure in criminal prosecutions in Missouri and to develop guidelines for the application of the defense in varying factual situations.

The blurring of the distinction between duress and justification has caused considerable difficulty in the analysis. *People v. Unger, supra,* has come closer to grappling with the real issues in such a defense under the Illinois statute, Ill.Rev.Stat.1971, Ch. 38 § 7–13. The Illinois statute is very similar to the Missouri statute, § 563.026 RSMo 1978. *Unger* flatly rejects the *Lovercamp* conditions and finds that submission of the defense is authorized when the only evidence offered was evidence concerning the impending harm to the escapee. The *Unger* court states that the *Lovercamp* preconditions were matters which go to the weight and credibility of the defendant's testimony.

While it is true that evidence concerning the surrender of the prisoner or an attempt to do so obviously bears upon the credibility of the prisoner's claim of necessity in the escape, it is hard to see how the lack of violence has any such implication. The more terror stricken the prisoner, the more risk he might take in escaping and the more

likely he might be to use violence. This lack of violence condition must be attributed to a rationale based on public policy rather than any other basis.

The *Lovercamp* requirements of complaint to authorities and recourse to the courts have, of course, some reinforcing effect on the issue of credibility, but are likewise equally equated to policy arguments that, if another form of relief was available, escape should not be justified. No one could argue with the proposition that this is a valid policy—if effective relief is available, then escape is not justified.

However, discussion of these conditions blunts the real thrust of the inquiry. The imminent danger of injury is the only basis for a defense of justification. That danger may arise suddenly and without opportunity for complaint or legal process. To put a simple illustration: if prisoners are being transported from a work area to the prison and one prisoner makes an assault upon another with a knife and the assaulted prisoner leaps from the truck and runs into the woods, the escape would be justified. No amount of legal ingenuity can make recourse to legal protections a condition precedent to the act of escape being justified. Of course, that does not mean that if the claimed imminent danger arises out of a continuing course of conduct that the presence or absence of attempted recourse to other remedies does not impinge on the extent of the danger and the credibility of the recitals of the escapee.

As previously noted, the absence of violence in the escape is not readily equated to a credibility issue. The policy rationale that violence in escape efforts should not be rewarded by permitting the defense when violence is used is flawed by a failure to recognize the separate offenses. If a prisoner escapes, that is a single offense. If in the course of the offense of escape, an assault is committed, that is a separate offense and can be separately charged. No reason appears why such offenses cannot be submitted to a jury separately with the claim of justification or necessity under appropriate instructions. The jury will make the determination necessary in the balancing of the public interest and the claim of danger by the escapee.

█ To summarize, the essential element which permits the submission of the defense of necessity is the imminence of danger to the person of the escapee. Voluntary return or attempts to do so and, in some instances of continued harassment, recourse to administrative and legal remedies will bear on issues of credibility. These issues bearing on the credibility of the prisoner's claim can be developed in the evidence and cross examination. All would be sources of argument to the jury based upon the record made at the trial. The jury can be trusted to separate the wheat from the chaff, and it is unlikely that escapes will be justified except in circumstances where the facts support the basic premise of immediate danger and the whole context of the situation supports the credibility of the claim made.

As pointed out by the Supreme Court in *Bailey, supra,* the defense presents no different procedural problem than any other affirmative defense in terms of the respective roles of the judge and jury. The initial determination of submissibility must be made by the trial judge. The test of such submissibility is not complex under the analysis made.

█ The defense should be submitted when the offered evidence, if believed by the jury, would support a finding by them that the offense of escape was justified by a reasonable fear of death or bodily harm so imminent or emergent that, according to ordinary standards of intelligence and morality, the desirability of avoiding the injury outweighs the desirability of avoiding the public injury arising from the offense committed to avoid injury to the prisoner.

█ Returning to the issue posed by this case, the initial task is to determine the submissibility of the defense. In doing so, the offers of proof are assumed to be true on the issue of submissibility. Offers of proof were made by the defendant and three witnesses, all of whom were inmates

at the Missouri Training Center which, if believed, demonstrate the following facts. Around July 1, 1976, in the prison kitchen where defendant was working, four black inmates told defendant they were going to make defendant their "punk" (prison vernacular for the individual who submits to homosexual acts by other inmates), and that they threatened to hurt defendant if he refused. Defendant refused these advances.

Defendant also testified that on or about July 25, in the steam room of the kitchen, three black inmates surrounded him, each holding a stainless steel ladle about 3–4 feet long. One of the inmates asked defendant if he was going to be their punk. When defendant answered "no," defendant indicated that one of the inmates tightened his hands on the ladle and drew it back a little. Defendant would also have testified that at about that time a voice outside the steamroom said, "Here comes the man," and a cook, a civilian employee at the Center, came into the steam room shortly after the three black inmates left.

Defendant was later granted a transfer to garden maintenance. Upon occasion these black inmates would come to the garden shops to pick up supplies for the kitchen and one told him his move away from the kitchen would do no good.

On about August 15, defendant and his escape companion, Jimmy Bunch, were seated on the floor with other white inmates with the black inmates on the bleachers behind them, watching a movie. Jimmy gave defendant a shove to protect defendant from a brick that was thrown at him from behind by one of the blacks. Defendant was struck by the brick, and his wound required five stitches given at the prison hospital. Jimmy Bunch offered to corroborate this story. Again, around September 10th or 15th, defendant was out at the yard shop concession stand when he got hit on the head from behind and turned around to find four black inmates, roughly those who had been bothering him. A fight ensued. By the time the guards came by, defendant would have testified, the inmates were gone. At the end of September, defendant was approached again by four or five black inmates who shoved a barbell back on his chest while he was lifting weights and asked if he was going to be their "punk." He said he tried to give them the sort of answer that would leave the impression that he would go along so they might leave him alone.

On October 2nd, defendant would have testified that the same inmates threatened to kill him if he backed out of being their "punk" and that they shoved him around at the time. When he went back to his room before dinner, a note had been shoved under defendant's door. Defendant would have testified that this note said, "Baker, if you don't do as we say, then don't be planning on living very long." The note was unsigned but written on the same paper upon which inmates write letters to the prison administration known as a "kite." Defendant later gave his note to the housing unit guard, said he wanted to be put in "check-in," but the guard told defendant the note was just a practical joke. It was on October 3rd that Jimmy Bunch and defendant, who had been transferred back to the kitchen, decided to escape because defendant believed that he was immediately in danger of serious bodily injury by reason of these beatings, pressure, and threats—especially the note.

Alfreddie Nevels, an inmate at the Center, would have testified that an inmate nicknamed "Wild Child" was one of the people giving defendant trouble and that he, Nevels, had asked "Wild Child" to leave defendant Baker alone. "Wild Child" told Nevels to stay out of it, that they intended to make defendant their punk. Nevels reported that his attempt to get the group to desist was unsuccessful.

Raymond Harris, another inmate at Moberly, would have testified that on September 1, at the yard shack concession stand, three or four black inmates told him they were going to rape the defendant and wanted Harris to help them. Harris would have testified that he refused to help them and, in fact, asked them not to do it, but

they refused, spotted defendant Baker and proceeded to hit and slug defendant until someone called a warning as guards approached.

This evidence is sufficient to support the basic submission. It is for the jury to say if the evidence offered is true. As Justice Rehnquist states in *Bailey, supra*, 100 S.Ct. at 636, 637:

> "The Anglo-Saxon tradition of criminal justice, embodied in the United States Constitution and in federal statutes, makes jurors the judges of the credibility of testimony offered by witnesses. It is for them, generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story. An escapee who flees from a jail that is in the process of burning to the ground may well be entitled to an instruction on duress or necessity, 'for he is not to be hanged because he would not stay to be burnt.' *United States v. Kirby*, 74 U.S. [7 Wall.] 482, 487, 19 L.Ed. 278 (1868)."

There is other evidence in the offer which bears on the issues of credibility. While defendant and Bunch were at large, defendant called his family at about 4 p. m. to assure them that he was all right. His parents told him that Superintendent White had called and left a number for him to call. Defendant would testify that at about 6:30 p. m. on October 4, he called White, told him of the threats and said he would turn himself in if White would give him some protection. White told defendant he couldn't promise him anything. Defendant said he would think it over and call White back in the morning. The escapees were apprehended the next morning.

Officer Brown of the North Kansas City Police Department testified that defendant Baker and Bunch offered no resistance when they were apprehended at the Ben Bolt Hotel. In addition, Dale Riley, Assistant Superintendent of Moberly Center, testified that to his knowledge there was no evidence of injuries, and no threats to any inmate, guard, or civilian by defendant in the course of the escape.

Defendant Baker offered to testify to several attempts made by him to the Training Center administration to be placed in "check-in," a small unit of 30–40 inmates at Moberly, segregated from the general prison population because they have had problems in being able to take care of themselves. For example:

(a) Defendant offered to show that he spoke with a case worker, Steve Long, about wanting a transfer because he was having problems, but that Long told defendant he was a good size fellow who should go out into the population and take care of his own problems.

(b) On July 15, defendant wrote a "kite" (interdepartmental correspondence) to Carl White, Center Superintendent, requesting placement in check-in due to Officer Arney's failure to assist him with his problems with the black inmates, but that he got no response.

(c) Defendant made a second request to Carl White on July 25. He received no response.

(d) Defendant again talked to Sgt. Arney who responded that defendant just wanted to get out of work.

(e) A third "kite" was written to Carl White on August 11 about being placed in check-in, but he got no response.

(f) On August 16, defendant wrote to Dale Riley, Assistant Superintendent of the Center, after he was hit on the head at the movie, and told of the incident, his letters to Mr. White, and requested placement in "check-in." About a week later, defendant was called to Riley's office and told Riley his whole story. While Riley asked the names of the inmates bothering defendant, defendant said he did not know but one of them was called "Red Dog." Riley terminated the interview telling defendant there was nothing he could do.

(g) Finally, defendant would have testified to delivering the threat letter to an unidentified guard who refused to recommend him for check-in on the basis of a practical joke like the note.

All of the foregoing is appropriate evidence for the jury to consider in weighing

the issue. Some of the evidence cuts both ways, an appropriate area for argument. No doubt the state may be able to present countervailing evidence on some of the matters contained in the offer. When it is all before the jury, it will be for them to say whether the defense is sustained. In the instant case, the trial court should have admitted the evidence and submitted the defense. The trial court may be guided by the briefs and this opinion on the other issues raised if they recur in a new trial.

The judgment and conviction are reversed and remanded for a new trial.

All concur.