[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1144 
OPINION
Defendant Robin Bailey was initially charged in a single count with escape and attempt to escape from the Correctional Training Facility (CTF) in violation of Penal Code section 4530, subdivision (b).[1] An escape or an attempt to escape from prison constitutes a crime under section 4530, subdivision (b); both are subject to the same punishment. Apparently, with the court's approval, the parties agreed that the case would be tried solely as an escape. A jury found defendant guilty of escape. It also found true that defendant had five prior felony convictions within the meaning of section 1170.12, subdivision (c)(2). The court sentenced defendant to 25 years to life.
On appeal from the judgment, defendant challenges the sufficiency of the evidence to show the crime of escape. He maintains that this court cannot modify the conviction to an attempt to escape because the jury was not instructed on attempt. Defendant also argues that the trial court erred by "threatening" to give an attempt instruction and the trial court improperly limited defense counsel's closing argument in violation of his Sixth Amendment right to counsel when counsel began to intimate that escape from prison required the defendant to have left the prison facility. Lastly, defendant *Page 1145 
asks this court to correct the minutes and abstract of judgment to correctly reflect the $200 restitution fine imposed by the trial court.
We conclude that the evidence is insufficient to show a violation of section 4530 by escape from prison and reverse the conviction.
A. Evidence
The parties stipulated that, on June 18, 2008, defendant was a prisoner who had been convicted of a felony. The evidence properly viewed (see People v. Story (2009)45 Cal.4th 1282, 1296 [91 Cal.Rptr.3d 709, 204 P.3d 306]; see Jacksonv. Virginia (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560,99 S.Ct. 2781]) also showed the following.
Defendant Bailey was an inmate in CTF's central facility in Soledad. He was housed in a G wing cell.
A few minutes before 7:30 a.m. on June 18, 2008, Correctional Officer David Doglietto and Correctional Officer Joseph Netro were dispatched to CTF's central maintenance area in response to a report of a break-in at the carpentry shop there. Tools were reported missing.
Officer Doglietto discovered a cut in the fence between the maintenance area and an area containing Conexes. When Officer Netro went over to inspect the fence, a staff electrician pointed out an inmate beyond the fence in an area accessible through a locked pedestrian gate.
About 7:55 a.m. on June 18, 2008, Abel Munoz, a correctional officer at CTF assigned as an O wing roof gunner, was stationed on top of the O wing roof, an interior location. His job was to keep security of the five administrative segregation yards where inmates were housed and to prevent fights and escapes. From his position on the O wing roof, Officer Munoz saw defendant Bailey, an inmate, hiding behind a Conex, a big storage unit.
Defendant was looking around the side of the Conex, "darting his head back and forth." Inmates are not ordinarily in that area without an officer or supervisor. Officer Munoz asked defendant what he was doing and defendant replied that he was waiting for his supervisor. Defendant could not name his supervisor but told Munoz that his supervisor was over by the silver truck. This response seemed suspicious to Munoz who could not see anyone standing by the truck and knew that Correctional Officer Stephens, who drove that truck, had "already entered underneath Central." After the officer told defendant to stay put, defendant went behind the Conex. Officer Munoz telephoned Officer Stephens and alerted him to the unsupervised inmate. *Page 1146 
Officer Stephens was in the central tunnel, which is located underneath the central facility. Officer Stephens was the inmate day labor officer and was supervising a 15-member construction work crew. Officer Stephens went out to the Conexes by the O wing yard and made contact with defendant Bailey.
Defendant said that his boss had allowed him into the area. This explanation did not make sense to Officer Stephens because the area was fenced and keys were required to get in. Officer Doglietto and Officer Netro joined Officer Stephens. Officer Netro handcuffed defendant. Defendant was wearing a CDC (California's Department of Corrections and Rehabilitation) jacket on which the standard bright yellow lettering "CDC Prisoner" had been blacked out.
Ismyanto Soekardi, the correctional sergeant, arrived at the maintenance area where Officer Netro had custody of defendant. The closest perimeter fence, which if scaled by an inmate would put him "out on the streets," was about 500 yards away.
To arrive at the location where he was apprehended, defendant had hacksawed through the bars of his cell in the central facility G Wing, removed the windows, and cut through a metal screen. Defendant had breached four fences, including the G wing perimeter security fence, the central chapel yard gate, a rooftop fence on the central facility textile building, and the fence separating the central maintenance area, where the carpentry shop was located, from the Conexes. He had made his way to the east end of the central facility. Defendant had actually gone deeper into the interior of the institution after breaking out of his cell.
At trial, defendant admitted taking the reconstructed route shown in the DVD played for the jury. It showed the fence breaches and a path along the roof corridor. Defendant also said that he had leaped over a razor wire wearing three pairs of pants. He admitted that he had left the area in which he was confined.
Later that same day, a hacksaw blade was discovered on top of a Conex. Two tools were located underneath the Conex. Wire strippers were found near the breach in the maintenance area fence. When officers examined defendant's cell, they found a lump of clothing in the upper bunk covered by blankets. A more thorough search of defendant's cell on June 19, 2008, uncovered hidden hacksaw blades.
Sergeant Soekardi explained that between the central facility and the north facility there are three inner towers: towers five, six, and seven, which were "manned 24/7." However, the roof is not staffed "24/7." The sergeant stated that no officers were stationed in the area of the maintenance yard fences "at [the] time of his attempt." *Page 1147 
Sergeant Soekardi spoke with defendant after he had been apprehended. Defendant admitted to having a plan to escape. He said that his plan had been to cut through a fence behind G wing and "make his way towards North Facility," cut through a double fence, and meet someone who was supposed to be waiting there to pick him up. He explained that he was unable to execute this plan because it took him "so long to cut out of the G Wing fence" and because cutting the G wing fence was "so loud." Defendant wrote letters to his daughter and son indicating he had tried to escape. At trial, however, defendant claimed that he had no intent to escape but rather he had merely planned to reach the maintenance area, where he intended to assault another inmate against whom he held a grudge, and then return to his cell.
B. Procedural History
As stated, the information originally charged attempt to escape and escape from CTF in violation of section 4530, subdivision (b). The People's trial brief stated that "[o]n June 18, 2008, defendant a prisoner at the Correctional Training Facility, Soledad, in Monterey County, attempted to escape." Defendant's trial brief stated that he had been charged in count one with escape and attempt to escape. During pretrial proceedings, the prosecutor told the court: "Although [defendant] didn't make it outside the outer perimeter, I feel legally it qualifies as an escape since he sawed though the bars of his cell and made several holes in several fences and was where he was not authorized to be."
Before closing argument, the court gave instructions to the jury, including an instruction regarding escape: "The defendant is charged with escape, in violation of Penal Code section 4530
(b). To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant was a prisoner who had been convicted of a felony; two, the defendant was confined in prison; three, and the defendant escaped from the prison, [¶] Escape means the unlawful departure of a prisoner from the physical limits of his or her custody. It is not necessary for the prisoner to have left the outer limits of the institution's property. However, the prisoner must pass beyond some barrier, such as a fence or wall, intended to keep the prisoner within a designated area."
In closing, the prosecuting attorney argued that the crime of escape did not require the prisoner to get outside that last fence and be home free and the prisoner did not have to leave the outer limits of the prison's property. She stated that the prisoner must pass beyond some barrier, such as a fence or a wall. She emphasized that defendant had sawed through the bars of his cell and escaped his cell. She argued that the breached fences were supposed to keep defendant where he belonged within the prison. *Page 1148 
Defense counsel implied that, contrary to the prosecution's argument, going through the bars or fences was not sufficient to show an escape. He told the jurors that, if they carefully looked at the escape instruction, they would see that no escape had occurred. The prosecuting attorney objected on the grounds that this argument was misleading and the court had defined "escape" in its instructions. After the court indicated that defense counsel was required to go over the entire instruction if he wanted to discuss the instruction, defense counsel read the instruction's definition of escape to the jury and then emphasized that the instruction said "property," implicitly referring to "the outer limits of the institution['s] property." Again, the prosecuting attorney objected on the ground the argument was misleading the jury.
In a discussion outside the presence of the jury, defense counsel cited People v. Lavaie (1999)70 Cal.App.4th 456 [82 Cal.Rptr.2d 719]. Neither the court nor the prosecuting attorney was familiar with the case. The prosecuting attorney complained that the case contradicted the agreed-upon instructions and asserted that "[t]he jury has been instructed according to CALCRIM 2760, and any case law in contradiction of it is not the jury instruction." Defense counsel maintained that he was not contradicting the instruction and explained that the fact scenarios in the case law indicate that the wall or barrier at issue was the exterior perimeter of the institution.
The trial court indicated that it was willing to permit the People to again amend to charge both escape and attempt to escape and to allow counsel to briefly argue the point. The court indicated that, if the jury concluded defendant had not escaped from prison, it would then determine defendant's intent. Defense counsel objected and complained that it had been determined that the case would be tried as a "straight escape." Counsel stated, "If that's the Court's inclination, we would rather limit our closing argument and leave it at that." Defense counsel reiterated that, "I'm saying that I would agree to limit my closing arguments." The court stated it had not realized "why there was such a ready acquiescence to eliminating the attempt at that time." The court acknowledged that there was no case holding that "an escape through the inner wall is an escape completed in and of itself." The court indicated that it could not see how trying the case as an escape, rather than as an attempt, had altered the defense's strategy and that it did not have "any big problem" with amending the information to charge attempt to escape. Defense counsel stated, "rather than go through that, I would gladly limit my closing argument."
After further discussion, the court asked defense counsel whether he was indicating that he would rather not argue the point and stay within the escape instruction. The defense counsel indicated that he would not argue the point. The court did not instruct the jury regarding attempt to escape. *Page 1149 
C. Escape from State Prison
Section 4530, subdivision (a), provides: "Every prisoner confined in a state prison who, by force or violence, escapes or attempts to escape therefrom and every prisoner committed to a state prison who, by force or violence, escapes or attempts to escape while being conveyed to or from such prison or any other state prison, or any prison road camp, prison forestry camp, or other prison camp or prison farm or any other place while under the custody of prison officials, officers or employees; or who, by force or violence, escapes or attempts to escape from any prison road camp, prison forestry camp, or other prison camp or prison farm or other place while under the custody of prison officials, officers or employees; or who, by force or violence, escapes or attempts to escape while at work outside or away from prison under custody of prison officials, officers, or employees, is punishable by imprisonment in a state prison for a term of two, four, or six years."[2] Section 4530, subdivision (b), provides for lesser punishment of a "prisoner who commits an escape or attempts an escape as described in subdivision (a), without force or violence. . . ." The crime of escape is a general intent crime for which no specific intent is required (see People v. Hayes (1971) 16 Cal.App.3d 662, 666-668
[94 Cal.Rptr. 222]; People v. Richards (1969)269 Cal.App.2d 768, 777, fn. 10 [75 Cal.Rptr. 597]). The term "escape" is not defined by statute but has been interpreted by case law.
In People v. Quijada (1921) 53 Cal.App. 39
[199 P. 854], the defendant was prosecuted under former section 105, from which section 4530 was derived. (53 Cal.App. at p. 40.) The defendant argued that the evidence did not show an "escape" but merely "`an attempt to escape.'" (Ibid.) The evidence showed that the defendant, who was working in a prison's stone yard, seized a locomotive with fellow prisoners. (Id.
at pp. 40-41.) They ran the locomotive through the prison yard, through a large locked gate, and beyond the walls of the prison before they were recaptured on the prison's property. (Id. at pp. 40-41.) The appellate court, relying on two out-of-state cases, determined that the term "escape" means "`the unlawful departure of a prisoner from the limits of his custody.'" (Id. at p. 41.) The appellate court stated: "When the defendant went beyond the prison walls without permission of the authorities he unlawfully departed from the limits of his custody, and it is immaterial that he did not get entirely beyond the territory connected with the prison grounds. It was his duty to remain within the walls as he very well knew, and when he transcended these limits he necessarily `violated his lawful custody.'" (Ibid.) *Page 1150 
In People v. Sharp (1959) 174 Cal.App.2d 520
[344 P.2d 796], the defendant argued that he had not escaped from prison within the meaning of section 4530 because he did not leave the prison's grounds. (Id. at p. 522.) The evidence showed that "[t]he prison was surrounded by a fence," which "marked the outer limits of the security area." (Ibid.) "Inmates were authorized to be outside the fence only when under supervision following proper authorization." (Ibid.) The defendant, who was in the recreation yard inside the fence, scaled the fence and ran into the open field beyond the fence. (Ibid.) The defendant was apprehended in the field, which was prison property. (Id. at pp. 522-533.) The appellate court found the evidence sufficient to show escape, stating: "Going beyond that fence without permission would be an unlawful departure from the limits of an inmate's custody even though when apprehended he was in a field (beyond the fence) which also was prison property. (See People v. Quijada,53 Cal.App. 39, 41. . . .)" (Id. at p. 522.)
In People v. Temple (1962) 203 Cal.App.2d 654
[21 Cal.Rptr. 633], the defendant contended that the trial court had misinstructed the jury regarding the definition of escape and he was not guilty of escape "since he did not get entirely off the prison premises. . . ." (Id. at p. 658.) The evidence showed that the defendant was restricted to a security area in the north facility of CTF at Soledad, "which was surrounded by a security fence some 12 to 15 feet in height." (Id. at p. 655.) When the defendant was supposed to leave a patio located in the security area and return to the housing units, he and other prisoners, in accordance with their escape plan, climbed over the security fence and ran into the field beyond the security fence. (Id. at pp. 655-656.) He was apprehended before reaching the northern boundary of the prison's property. (Id. at p. 656.) The appellate court in Temple stated: "Since the decision in People v.Quijada, 53 Cal.App. 39 . . . it has been the settled law of this state that an escape is the unlawful departure of a prisoner from the limits of his custody. Here the defendant was restricted to a certain area of the prison at Soledad. He had no permission to leave the area where he was confined; with others, and pursuant to a plan, he climbed the fence and fled several hundred yards across a field until halted by the fire of the guards. It is of no consequence that he had not completely escaped from the prison premises." (Id. at p. 658.)
In People v. Lavaie, supra, 70 Cal.App.4th 456, the defendant appealed from a conviction of escape from a state prison following a court trial. He challenged the sufficiency of the evidence on the ground that there was no proof he had left the prison camp where he was an inmate. (Id. at p. 457.) The evidence indicated that, sometime between 12:30 a.m. and 1:00 a.m., *Page 1151 
officers on patrol saw two men in an out-of-bounds area of Camp 19, a state correctional facility, but within the perimeter fence of the camp. (Ibid.) Following a search, the defendant was determined not to be in any area permitted to inmates at that time of night and was eventually seen "at 3:15 a.m., walking down the steps from the kitchen and dormitory area." (Id. at pp. 457-458.) The defendant "had not requested permission or authority to go into an out-of-bounds area that night." (Id. at p. 458.) The trial court's statements indicated that it found the "unlawful departure of a prisoner from the limits of his custody" based upon the defendant's "absence from the area where he was permitted to be, rather than from the camp itself." (Id. at p. 460.)
The appellate court in Lavaie determined that the trial court's interpretation of the crime of escape from prison was too broad. (Lavaie, supra,70 Cal.App.4th at p. 460.) It distinguished Temple and Quijada:
"In both Temple and Quijada, the prisoner had gone beyond one barrier, either a wall or a fence, but had not left the outer limits of the prison property."[3] (Peoplev. Lavaie, supra, 70 Cal.App.4th at p. 461.) The court stated: "We have found no cases recognizing an escape when a prisoner remains within the camp or prison barriers, but is outside the particular area within the camp or prison where he is permitted to be." (Ibid.) It found the evidence insufficient to prove escape. (Ibid.) The court stated, "[w]hile this evidence may be sufficient to show that appellant violated prison rules, it is insufficient to support a conviction for escape." (Id. at p. 462.)
Defendant maintains that a prisoner's unlawful departure from the limits of his custody occurs only when the prisoner goes beyond the "secure perimeter" of a CDC facility. He relies uponLavaie and California Code of Regulations, title 15, section 3000, which defines terms, including the terms "attempted escape," "custody of the department," "secure perimeter," and "security perimeter," as used in the regulations of adult operations and programs. The People argued that defendant "intentionally broke through barriers that were erected to prevent escapes" and "effectively went beyond the limits of his confinement and escaped." The People assert that this case is more similar to People v. Steele (1988)206 Cal.App.3d 703 [253 Cal.Rptr. 773]. *Page 1152 
We recognize that "[t]he contemporaneous construction of a new enactment by the administrative agency charged with its enforcement, although not controlling, is entitled to great weight. [Citations.]" (Dyna-Med, Inc. v. Fair Employment Housing Com. (1987) 43 Cal.3d 1379, 1388-1389
[241 Cal.Rptr. 67, 743 P.2d 1323].) But the administrative definitions cited by defendant are of no relevance here since they are completely unrelated to section 4530.
Steele, which was cited by the People, is also unhelpful. There was no sufficiency of the evidence issue inSteele. Steele's sole contention was that the trial court erred by refusing to give his requested instruction on the defense of duress. (People v. Steele, supra,206 Cal.App.3d at p. 705.) The court did not discuss or decide the precise meaning of an "unlawful departure from the physical limits of custody" in the context of an alleged escape from prison. "`It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court.' [Citation.]" (Agnew v. State Bd. of Equalization (1999)21 Cal.4th 310, 332 [87 Cal.Rptr.2d 423, 981 P.2d 52].)
We now turn to this case. Defendant broke out of his cell and breached a number of interior barriers. These circumstances differentiate this case from Lavaie, which apparently involved a lower security camp. Nevertheless, as inLavaie, defendant remained within the boundaries of the facility where he was incarcerated. By contrast inTemple, the defendant had impliedly left CTF's north facility and was on his way to the northern boundary of the prison's property.
The evidence in this case did not demonstrate that defendant had managed to go beyond the bounds of CTF's central facility. Instead, the evidence was that he had gone further into CTF's interior after breaking out of his cell and had ended up in the east end of CTF's central facility. As the court instructed, to prove escape, the People were required to establish that, among other things, "the defendant escaped from the prison." While case law explicates the meaning of "escape," the statutory language at issue here still requires an escape from prison ("Every prisoner confined in a state prison who . . . escapes or attempts to escape therefrom"). Case law clearly establishes that it is not enough to have reached an unauthorized location or be out of bounds within the prison institution or facility.
The word "depart" means "to go away from" or "leave." (American Heritage College Dict. (3d ed. 1993) p. 372; see Webster's 3d New Internat. Dict. (1993) p. 604 ["depart" defined as "to go away from or out of or *Page 1153 
"leave"].) The commonly understood meaning of the word "limits" is "[t]he boundary surrounding a specific area; bounds." (American Heritage College Dict., supra, p. 787; see Webster's 3d New Internat. Dict., supra, p. 1312 ["limits" defined as "the place or area enclosed within a boundary: BOUNDS"].) The "specific area" in this case is the prison facility having custody of the prisoner.
Under well-established principles of statutory interpretation, courts should give meaning to every statutory word if possible and should avoid a statutory construction that renders any word surplusage. (Cooley v. Superior Court (2002)29 Cal.4th 228, 249 [127 Cal.Rptr.2d 177, 57 P.3d 654].) (5) Thus, the meaning of "the unlawful departure of a prisoner from the limits of his custody" must be understood in reference to the "state prison" from which the prisoner allegedly escaped in violation of section 4530. Thus, proof of escape from prison requires a showing that the prisoner has gone beyond the boundary of the prison facility having custody of that prisoner. An inmate who remains within the bounds of the prison has not escaped that prison even if he has broken out of his cell and breached interior security barriers.
We agree that the evidence was insufficient to show an escape from prison within the meaning of section 4530. But the evidence was more than ample to establish an attempt to escape from prison. Defendant does not suggest otherwise but he maintains that this court cannot reduce the crime to attempt to escape because the jury was not instructed on attempt to escape and, consequently, the jury was required to either convict or acquit defendant of the crime of escape and this court may not reduce the conviction.
The California Supreme Court "has long recognized that under Penal Code sections 1181, subdivision 6, [fn. omitted] and 1260, an appellate court that finds that insufficient evidence supports the conviction for a greater offense may, in lieu of granting a new trial [on a lesser included offense], modify the judgment of conviction to reflect a conviction for a lesser included offense." (People v. Navarro (2007)40 Cal.4th 668, 671 [54 Cal.Rptr.3d 766, 151 P.3d 1177].) Attempt to escape is not a lesser included offense of escape based upon the elements of the offense impliedly found true by the jury.[4] In the past, courts have sometimes reduced a conviction of an offense to an attempt where evidence was insufficient to prove the former but sufficient to prove the latter. (See Peoplev. Rojas (1961) 55 Cal.2d 252, *Page 1154 
260-261[5] [10 Cal.Rptr. 465, 358 P.2d 921] [finding of receiving stolen property reduced to attempting to receive stolen property where, unbeknownst to the defendant, the property had been intercepted by police before receipt]; see also People v.Layman (1968) 259 Cal.App.2d 404, 409 [66 Cal.Rptr. 267] [verdicts of grand theft reduced to attempts to commit grand theft].) As now understood, however, the right to due process and right to jury trial under theSixth Amendment to the United States Constitution, made applicable to the states under theFourteenth Amendment to the United States Constitution (seeDuncan v. Louisiana (1968) 391 U.S. 145, 149-150
[20 L.Ed.2d 491, 88 S.Ct. 1444]), "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. [Fn. omitted.] Sullivan v. Louisiana,508 U.S. 275, 277-278 [124 L.Ed.2d 182, 113 S.Ct. 2078,2080-2081] (1993)." (United States v. Gaudin (1995)515 U.S. 506, 510 [132 L.Ed.2d 444, 115 S.Ct. 2310]; seeU.S. Const., 14th Amend, [states prohibited from depriving any person of liberty without "due process of law"]; see also Sullivanv. Louisiana, supra, 508 U.S. at p. 277 [6th Amend. right to trial by jury includes the right to have jury, rather than judge, reach the finding of guilty; judge may not direct verdict for the state, no matter how overwhelming the evidence].)
Because the trial court failed to instruct the jury regarding an attempt to escape from prison[6] and the evidence is not sufficient to support the conviction of escape from prison, we must reverse. As a result, we do not reach the remaining contentions. *Page 1155 
The judgment of conviction is reversed.
Premo, Acting P. J., and McAdams, J., concurred.
[1] All further statutory references are to the Penal Code.
[2] "A person is deemed confined in a `state prison' if he is confined in any of the prisons and institutions specified in Section 5003 by order made pursuant to law, including, but not limited to, commitments to the Department of Corrections. . . ." (§ 4504.)
[3] The bracketed portion of the standard instructional definition of escape provides: "It is not necessary for the prisoner to have left the outer limits of the institution's property. However, the prisoner must pass beyond some barrier, such as a fence or wall, intended to keep the prisoner within a designated area." It was derived from this language inLavaie and is supposed to be given when "there is an issue as to whether the defendant went far enough to constitute an escape." (Judicial Council of Cal. Crim. Jury Instns. (2009-2010 ed.) Bench Notes to CALCRIM No. 2760, p. 694.)
[4] "Attempt to escape" from prison requires proof of specific intent to escape (see § 21a; see also People v.Gallegos (1974) 39 Cal.App.3d 512, 517
[114 Cal.Rptr. 166]).
[5] This court expresses no opinion regarding the application of People v. Rojas, supra, 55 Cal.2d 252 in circumstances different from those present here. Rojas has been cited for the proposition that "[w]here a defendant has the requisite criminal intent but 'elements of the substantive crime [are] lacking' due to 'circumstances unknown' to him, he can only be convicted of attempt-and not the substantive crime itself. (People v. Rojas (1961) 55 Cal.2d 252, 257-258 . . . [because the property was not actually stolen, defendants were guilty of attempted receipt of stolen property]; see also People v. Camodeca (1959) 52 Cal.2d 142, 147 . . . [because the victim was not deceived by and did not rely on the false representations, defendant was guilty of attempted grand theft by false pretenses].)" (People v. Rizo (2000) 22 Cal.4th 681, 685.) This case does not fit the Rojas scenario. Moreover, in this case, there was conflicting evidence whether defendant had specific intent to escape and the prosecution made a deliberate decision to not prosecute defendant for attempted escape.
[6] Under California law, the trier of fact "may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." (§ 1159.) "It is well settled that the trial court is obligated to instruct on necessarily included offenses — even without a request — when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." (People v. Ramkeesoon (1985) 39 Cal.3d 346,351 [216 Cal.Rptr. 455, 702 P.2d 613].) This rule presumably extends to attempts. (See People v. Lopez (1998)19 Cal.4th 282, 287 [79 Cal.Rptr.2d 195, 965 P.2d 7131 ["A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial."].) "[A] defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt. Our courts are not gambling halls but forums for the discovery of truth." (People v. St. Martin (1970)1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390].) "[N]either the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged." (People v. Barton (1995) 12 Cal.4th 186,196 147 Cal.Rptr.2d 569, 906 P.2d 531].) "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.]" (People v. Sedeno (1974) 10 Cal.3d 703, 716. [112 Cal.Rptr. 1, 518 P.2d 9)3], fn. omitted, overruled on other grounds in People v. Breverman (1998) 19 Cal.4th 142,149, 165 [77 Cal.Rptr.2d 870, 960 P.2d 1094] and People v.Flannel (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) *Page 1156